[Cite as *State v. Kramer-Kelly*, 2023-Ohio-1031.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,         :

                    No. 111233

    v.                          :

BRIAN KRAMER-KELLY,                     :

    Defendant-Appellant.        :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED, VACATED, AND REMANDED
**RELEASED AND JOURNALIZED:** March 30, 2023

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-20-648409-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Eben O. McNair, Assistant Prosecuting Attorney, *for appellee*.

Mary Catherine Corrigan and Allison F. Hibbard, *for appellant*.

LISA B. FORBES, J.:

{¶ 1} Brian Kramer-Kelly ("Kramer-Kelly") appeals his convictions of rape and kidnapping. After reviewing the facts of the case and pertinent law, we reverse the trial court's decision, vacate Kramer-Kelly's convictions and prison sentence,

and remand this case to the trial court for further proceedings consistent with this opinion.

## I. Facts and Procedural History

{¶ 2} This case concerns Kramer-Kelly's convictions of the October 2018 rape of L.W. in Brecksville and the June 2019 rape of S.S. in Cleveland. Kramer-Kelly and his codefendant Anthony Guzi ("Guzi") were initially indicted on April 12, 2019, for raping L.W. in Cuyahoga C.P. No. CR-19-637946-A. Trial was set for March 2, 2020. However, on February 27, 2020, the state reindicted Kramer-Kelly and Guzi for raping and kidnapping L.W. in Cuyahoga C.P. No. CR-20-648409-A. In this new indictment, the state also included rape and kidnapping charges against Kramer-Kelly concerning the rape of S.S. On April 23, 2020, the state dismissed CR-19-637946-A.

{¶ 3} Kramer-Kelly's indictment in CR-20-648409-A includes the following seven counts: three counts of rape and one count of kidnapping in relation to L.W.; and two counts of rape and one count of kidnapping in relation to S.S. All rape counts include sexually violent predator specifications and both kidnapping counts include sexual motivation and sexually violent predator specifications. Guzi was also charged with two counts of rape and one count of kidnapping in relation to L.W., along with the aforementioned specifications.

{¶ 4} On March 4, 2020, Kramer-Kelly filed a motion for severance of the counts concerning L.W. from the counts concerning S.S. The court held a hearing on this motion in July 2020, and denied Kramer-Kelly's request.

{¶ 5} The case proceeded to trial, and on December 13, 2021, a jury found Kramer-Kelly guilty of all five rape counts concerning L.W. and S.S. and one count of kidnapping with a sexual motivation specification in relation to S.S. The jury acquitted Kramer-Kelly of the kidnapping count concerning L.W. That same day, the court found Kramer-Kelly guilty of the sexually violent predator specifications on all counts of which Kramer-Kelly was convicted.

{¶ 6} On January 6, 2022, the court vacated the sexually violent predator specification convictions and held a hearing on these specifications. On January 19, 2022, the court found Kramer-Kelly guilty of the three sexually violent predator specifications associated with S.S. and not guilty of the sexually violent predator specifications associated with L.W. The court sentenced Kramer-Kelly to life in prison with the possibility of parole after 21 years.

{¶ 7} On March 15, 2022, Guzi pled guilty to gross sexual imposition, pandering obscenity, and abduction in relation to L.W., and the court sentenced him to nine months in prison.

## II. Trial Testimony and Evidence

{¶ 8} The state presented testimony and evidence at trial in the following order.

### A. Holly Oster

{¶ 9} Holly Oster ("Oster") testified that she works at London Pickle Works ("the Pickle"), which is a bar and restaurant in Brecksville. On the night of October 5, 2018, and into the early morning hours of October 6, 2018, Oster was

"waitressing" at the Pickle, and it was "very busy." Oster knows L.W. as "a somewhat regular at the bar." L.W. was at the Pickle with "a bunch of people" that night. A "couple days" later, Oster got a phone call from the police, and "they stopped in" to the Pickle. Oster went to the police department and spoke with "somebody * * * about something that happened." Oster testified that she had "no direct or personal knowledge" about what happened to L.W. after she left the Pickle on the night in question.

{¶ 10} According to Oster, L.W. "seemed to be having a good time" that night, and she did not "seem like she was way out of things." L.W. was walking "fine" and she was not stumbling. Asked if L.W. looked "anywhere near like she was blacked out," Oster answered, "At the point when I saw her, no." Oster did not see L.W. leave the bar that night.

### B. Michael Dinallo

{¶ 11} Michael Dinallo ("Dinallo") testified that he and L.W. "were always kind of on and off for the five years that we have known each other," although they were not dating on the night of the incident in question. Dinallo and L.W. went to the Pickle around 10:30 p.m. on October 5, 2018. According to Dinallo, it was a busier than usual night, and he and L.W. were "hanging out * * * near the bar towards the right." They interacted with Kramer-Kelly and Guzi, who were sitting next to them at the bar. According to Dinallo, L.W. became "a little bit flirtatious" with Guzi.

{¶ 12} At some point that night, Dinallo told L.W. that he wanted to go home. L.W. told Dinallo that she did not want to leave. Dinallo left the Pickle without L.W. Within two minutes after he left the Pickle, he got a phone call from L.W. Dinallo testified that L.W. "didn't say anything. It was more I would say bar sounds, and then the phone got disconnected. And I tried calling her back and no one answered. That was the last that I spoke to her that night." According to Dinallo, L.W. had "a few shots" that night, but he did not remember how many.

{¶ 13} L.W. called Dinallo from her laptop the next morning at 9:15 to say that she lost her phone. Dinallo picked L.W. up and took her to the Pickle to look for her phone. According to Dinallo, L.W. "definitely seemed a little off." Subsequently, Dinallo, L.W., and L.W.'s mother went to the hospital "to get a rape kit."

{¶ 14} During trial, Dinallo testified as follows:

Q: Can you talk to the jury about the impact that reporting this and getting a rape kit has had, that you have observed that had on [L.W.] and it has had on you?

* * *

A: I mean, there — no one would want to go through the process of, you know, getting a rape kit done. Doing this for three years. There's just no way.

* * *

I mean, initially it had a tremendous impact. Just this — it took a mental toll on her. Obviously, on our relationship. And then, you know — yeah. I mean, it's been tough. I mean, it seems like it's — when she thinks that it's over with, that she doesn't have to think about it, it kind of comes back, and I think that's the hardest part.

* * *

Q: And can you tell the jury a little bit about kind of that process, of just mentally gearing yourself up for coming in and talking to 14 strangers about what happened in October of 2018?

* * *

A: Yeah. It's strange. I mean, it's nothing you want to talk to strangers about. I mean, it does take a toll on you. Like I said before, you know, you don't hear anything for weeks, months, and then it's kind of out of your head at that point. And then it kind of comes back. And just, you know, it's a hard process.

Q: Okay. Is there anything about this process that * * * you think is easy?

A: Absolutely not.

{¶ 15} On cross-examination, Dinallo testified that at no point during the night in question did the bartender at the Pickle cut off or stop serving L.W. According to Dinallo, when he left the bar that evening, L.W. "wasn't really * * * that drunk."

**C. L.W.**

{¶ 16} L.W. testified that on the night of October 5, 2018, and into the early morning hours of October 6, 2018, she and Dinallo went to the Pickle. L.W. and Dinallo were good friends who had previously dated. L.W. saw Guzi, a high school classmate of hers, at the bar. L.W. started talking and drinking with Guzi. Guzi introduced L.W. to Kelly-Kramer as his "boyfriend." L.W. testified that she was still sitting with Guzi and Kelly-Kramer when Dinallo left the bar.

{¶ 17} According to L.W., her memory of that night is "foggy or hazy" and parts of it "are just completely gone." L.W. recalled that, not long after Dinallo left

the Pickle, Guzi and Kelly-Kramer helped her "out to the car" because she "couldn't stand up" and she "had too much to drink." L.W. testified that she hit her head "on their car." L.W. described her state that night as: "Me falling all over the place, unable to form a full sentence, unable to stand up on my own and walk."

{¶ 18} L.W. testified that she did not remember anything between Kramer-Kelly and Guzi helping her to the car and waking up the next morning "in their bed. I was in the middle, and they were on either side of me. I was half dressed. I believe they were the same." L.W. testified that, when she woke up, she had no "sense" of what happened to her the prior night. According to L.W., Guzi drove her home. L.W. testified as follows about what happened when she got home: "I just remember going in my room and calling [Dinallo]. Telling him, I think something bad happened to me. He came over, and I started crying. I could feel how much pain I was in. And then I told my mom the same thing, and she told me to go to the hospital."

{¶ 19} Asked about the pain, L.W. testified as follows: "I mean, there was throbbing in my vagina that I've never felt before. My stomach hurt. I felt bruised. I just felt weak. My whole body hurt." L.W. also testified that she had "anal" pain. L.W. testified that she was "horrified" at the idea of going to the hospital, "[t]o think about having to get a rape kit and be undressed in front of strangers." The prosecutor asked L.W., "[W]hat is that process like, having a rape kit performed?" L.W. answered as follows: "It's terrifying. You're almost like you're getting violated

again. Having to be naked in front of strangers and having them take pictures all over your body. It was — it was horrible."

{¶ 20} According to L.W., she reported the incident to the police within a "day or two."

{¶ 21} Prior to going to the hospital, L.W. messaged Kramer-Kelly via Instagram, and the following exchange took place:

> L.W.: I need you to tell me everything that happened the other night. And also, do you have any idea where my phone could be?
>
> Kramer-Kelly: I have no clue where your phone is I don't remember you even having it when we left the pickle
>
> L.W.: Okay. Do you know when we left the pickle? And what happened at [Guzi's]?
>
> Kramer-Kelly: We left around like 1 and nothing happened at [Guzi's] besides us getting you inside so you could go to sleep.

{¶ 22} L.W. testified that she had seen pictures of Kramer-Kelly prior to the night in question, because he followed her on Instagram.

{¶ 23} Asked to describe "what this process has been like sticking with this for three plus years now," L.W. answered as follows:

> There's been multiple times that I debated giving up. Getting into this position, having to talk to a bunch of strangers about, you know, just the worst thing that ever happened to me, it's horrifying. And knowing that these people were living in the same city as me this entire time is horrifying. Having to sit in front of the grand jury and feel like you're the one who did something wrong and having them ask you questions over and over and over again about something that you're trying so hard to forget is hard. God. So I'm doing some, a lot of therapy, and I'm truly just trying to put this behind me.

{¶ 24} On cross-examination, L.W. testified that from approximately midnight on October 5, 2018, to 8:30 or 9:00 a.m. on October 6, 2018, she was blacked out and does not remember anything. According to L.W., she contacted the police on October 7, 2018, although she did not remember if she reported that her phone was missing and she was sexually assaulted or if she reported only that her phone was missing. L.W. met with Detective Grimm of the Brecksville police department on October 8, 2018.

**D. Nicole Rivera**

{¶ 25} Nicole Rivera ("Rivera") testified that she is a forensic scientist in the forensic biology and DNA division of the Ohio Bureau of Criminal Investigation. Rivera made DNA comparisons and generated a report based on evidence collected from L.W.'s rape kit. The evidence tested included L.W.'s bra and underwear, the swabs from L.W.'s rape kit, and known DNA standards from Dinallo, Guzi, and Kramer-Kelly.

{¶ 26} L.W.'s vaginal and anal swabs contained DNA from "at least two additional individuals" other than L.W., and "at least a portion of that additional data did contain male DNA." These swabs were "presumptive" for semen. Rivera testified that "presumptive * * * indicates that a bodily fluid could be present. It doesn't confirm that it is, in fact, that body fluid."

{¶ 27} Rivera testified that she was "able to exclude * * * Dinallo, * * * Guzi, and * * * Kramer-Kelly from the portion of that sample that I was able to make comparisons to." Specifically, Rivera testified as follows:

That portion of the DNA profile is either too low of quality or quantity for me to make any comparisons to, and that includes the number. I can — because of that quality or quantity it's hard to conclude definitively, but there is evidence of at least two additional individuals.

Q: Okay. And we talked a little bit about some of that DNA that you just — there's just not enough there to make an identification, and that's what this additional DNA is, right?

A: That's correct.

* * *

I can tell that there is at least male DNA present, which would indicate that at least one of those individuals is a male. As far as the second contributor, or the other contributor that's there, I couldn't make any conclusions. All I can say is that there is indication of male DNA. However, that portion of the DNA profile is unattributable.

* * *

Q: Now, I just want to clarify. It's a little confusing here where it says — and we'll start at the bottom — "* * * Kramer-Kelly excluded from interpretable data." And it makes it seem like there's no possible chance his DNA could have been in that vaginal swab. Is that true?

A: There is only a portion of the sample I was able to make comparisons to, that being the major portion of the contributor that was contributing more DNA than the others. To that portion I was able to include [L.W.].

And I am making exclusions similarly on that portion, and then that additional DNA, as I said, I couldn't make any comparisons to any individual.

Q: So — and I know we can't say definitively here — but could, could that male DNA you see in there, could that be * * * Kramer-Kelly's DNA?

A: Yes. It can potentially be any individual.

Q: It could be anybody. It could be any male DNA?

A: Any. So the additional data, like I said, it is from more than one other individual. There's at least two. So it could be male or female. But of a male portion specifically, yes, it could be.

Q: You're just not — you just can't read it well enough to tell us if it's * * * Kramer-Kelly's or not?

A: It could be any individual, yes.

Q: Right.

A: Kramer-Kelly or another is not where I can make a comparison.

Q: Fair enough. Thank you.

{¶ 28} Rivera testified as follows about L.W.'s oral swab: "The oral samples were again found to be positive for * * * the presumptive presence of semen. However, it was — the DNA results were that the sample contained no DNA profile foreign to [L.W.]." Rivera explained that this "essentially means that the sample was from one contributor, that contributor being [L.W.], and there was no evidence of any foreign DNA profile to her." Asked if "things like brushing your teeth, drinking, washing your mouth out, all of those things contribute to a lack of any foreign DNA," Rivera answered, "It can, yes."

{¶ 29} Rivera tested a swab from the crotch area of L.W.'s underwear from her rape kit and found a DNA "mixture," which was "presumptive positive" for semen. According to Rivera, she "was able to include * * * Kramer-Kelly as to the major portion of the sperm fraction. He was included — because he was included I provided the statistic that indicates how common or how rare that profile is. For this DNA profile the statistic is rarer than 1 in 1 trillion."

{¶ 30} Guzi was included "as a possible contributor to the major portion of the non-sperm fraction" of a swab of the back panel of L.W.'s underwear, with a statistic of "1 in 2 billion." Kramer-Kelly and Dinallo were "excluded from the

portion of the sample" that Rivera was able to make comparisons to.  Rivera further

explained:

> It — because I was able to include a male, that's why I can't indicate whether or not that additional data originates from a male or a female. In the case where I indicate that it includes a male, that is because I was only able to include a female.  So the male marker that we look for is either present or not present.  In this case, I was unable to do that.

{¶ 31} Rivera further tested a swab from L.W.'s buttocks and concluded that

this swab was negative for semen.  According to Rivera, the "sample was found to be

a mixture."  However, without any further explanation, she "was able to include * * *

Kramer-Kelly as a possible contributor to the major portion of the sperm fraction,"

with a statistic of "greater than 1 in 1 trillion."

**E.  Salesha Frantz**

{¶ 32} Salesha Frantz ("Frantz") testified that she is a forensic DNA analyst

with the Cuyahoga County Regional Forensic Science Laboratory.  Frantz testified

about a report generated by one of her former colleagues concerning the DNA

evidence collected from S.S.'s rape kit.  Seminal matter from "a single source of male

origin" was identified in the vaginal and anal swabs.  Frantz compared the DNA from

the seminal matter to known DNA standards from Kramer-Kelly and Guzi.

According to Frantz, a "match was identified between the sperm fraction" of the

vaginal swab and Kramer-Kelly, meaning that "it is 57.2 octillion times more

probable tha[t] Kramer-Kelly has contributed to this profile versus any other person

in the population."  Kramer-Kelly's DNA was also identified in the sperm fraction of

S.S.'s anal swab, as well as a swab from a "dried stain" on S.S.'s neck.

**F. S.S.**

{¶ 33} S.S. testified that on the night of June 1, 2019, into the early morning hours of June 2, 2019, she and a few friends, one of whom was named Tiffany, went to the Barley House in downtown Cleveland. They stayed until closing time, which was approximately 2:00 a.m. S.S. testified as follows about what happened next:

> [Kramer-Kelly] just randomly showed up, grabbed my hand, and was pulling me out. I tried to grab a bouncer and tell him, don't let me go. He told me * * * I had to leave. And then when I got outside, I kept telling him, I need my friends. I was trying to get back in. They told me, no, you've got to wait out by the trees.

> He made a phone call, said — and that's when — when he got on the phone, Tiffany exited. I held her hand, and he was making a phone call saying, I got the girls, I'm outside the Barley House, and he kept repeating it a couple times.

> * * *

> Tiffany was talking about not being done for the night, and that's when [Kramer-Kelly] was like, oh, I have friends at a hotel. * * * [A]nd that's when we continued on.

{¶ 34} S.S. testified that she had never seen Kramer-Kelly before this incident. According to S.S., she was willing to go to a hotel with Kramer-Kelly because her friends were with her. "Numbers. It's — they were comfortable with it, so I was comfortable." The group included S.S., Tiffany, Tiffany's friend Tex, and Kramer-Kelly. The four people walked to the Renaissance Hotel. According to S.S., she was "unsteady" on her feet and stumbled as they were walking to the elevator. This was captured on the hotel's surveillance video. Asked what her "state of intoxication" was at the time, S.S. answered, "I should have went home. * * * I was clearly under the influence."

{¶ 35} They went up to the hotel room, and another male[1] was already there. S.S. and Tiffany went into the bathroom. According to S.S., they both "felt kind of off. * * * Felt a little dizzy, sick. Like out-of-body type thing." S.S. testified that this was "[s]omething different" than alcohol intoxication. According to S.S., she "[j]ust felt light, like my whole body was — you couldn't move your arms. You — just felt weak."

{¶ 36} From the hotel room, S.S. texted her boss the following at 2:41 a.m.: "Hey call Me[.] We might be raped[.] Hello[.]" According to S.S., she felt this way because of "[t]he other gentleman" that was in the room.

{¶ 37} S.S., Tiffany, and Kramer-Kelly lied down on the bed. Soon after, Tiffany and Tex left. According to S.S., Kramer-Kelly then sexually assaulted her.

> He pulled off my shorts and underwear. He inserted his fingers. He got on top. I wasn't into it. I kept telling him it hurt, to stop. It hurt. And he said it would feel better after. When he was on top, he was holding my neck and tried like putting his weight on me.
>
> My phone started ringing for my ride, and I couldn't answer it. I told him that if I couldn't answer it, they're going to come up here, that I need to go. And that's when he finished.
>
> I got up, put my clothes back on. He said, by the way, if you need to know, my name's Brian. And I * * * exited the room.

{¶ 38} S.S.'s boss picked S.S. up outside of the hotel. S.S. told her boss what happened. S.S.'s boss immediately took her to the police station, and the police told her to go to MetroHealth hospital for a rape kit. Asked to describe to the jury "what that experience is like," S.S. testified as follows: "It's traumatizing. They swab your

---

[1] At trial, S.S. identified this other male as Guzi.

vaginal area. They swab your anus, your mouth, your fingers. They take pictures. They bag everything. They ask you a whole bunch of questions. So it's repeating what happened over and over again." According to S.S., a police officer came to MetroHealth to take her statement.

{¶ 39} S.S. met with a police detective on June 3, 2019, and told "the whole story again." She testified that she had to talk about what happened again when she talked to someone at the prosecutor's office and once again when they "switched" prosecutors. S.S. testified that she has never met nor spoken to L.W. In January 2020, S.S. picked Kramer-Kelly's photo out of a photo array as the man who raped her.

{¶ 40} Asked what impact the events at issue in this case had on her, S.S. testified as follows:

> This has — this has been like a horrible situation. I have seen a couple of counselors. I purchased a horse for therapy. They say animals are the best. I have gone through a few jobs. One, one previous job I was in I was there for four years, and I had to be removed from my position because I was having trouble working.
>
> I tried to talk to — I told the detective — doctors. I had to follow up just to make sure that I hadn't contracted sexually-transmitted diseases. My — emotionally, everything. My relationship suffered. My current one was on the brink. We need help. And I just want this over with so I can move on.

{¶ 41} On cross-examination, defense counsel played footage from Barley House's surveillance camera from the night in question. This footage shows S.S. and her friends interacting with Kramer-Kelly at the bar prior to closing time. S.S. is

leaning up against Kramer-Kelly, with her back touching his front. S.S. testified that she did not remember this interaction.

{¶ 42} Asked if she felt intoxicated when she was on the elevator with Kramer-Kelly, Tiffany, and Tex at the Renaissance Hotel, S.S. answered, "No. * * * Very little." Asked if she was aware that Guzi "was at home that evening on home detention," S.S. answered, "No." Asked if she was sure that Guzi was the man who opened the hotel room door when Kramer-Kelly knocked, S.S. replied, "No."

{¶ 43} S.S. testified that she did not fall asleep or pass out while she was in the hotel room and was "aware" of her surroundings. S.S. testified that she thought the other gentleman walked out of the hotel room behind Tiffany and Tex.

{¶ 44} Asked if she "allowed" Kramer-Kelly to take her shorts off, S.S. testified as follows:

A: Of course not.

Q: Okay. Did you say anything to him at that point in time?

A: I told him, stop.

Q: Okay. Did you grab your shorts to try to pull them back on?

A: Yes, I did.

Q: Did you try to hold them to you?

A: Yes.

Q: Okay. Did you yell for help?

A: No.

* * *

Q: Did you do anything else to try to stop him from taking your shorts off?

A: Pushing, that's it.

Q: Okay. Did you get off the bed?

A: No.

Q: Okay. At that point in time were you being held down so that you couldn't get off the bed?

A: Yes.

Q: How was that being done?

A: He was on top of me.

{¶ 45} S.S. further testified that Kramer-Kelly's fingers and penis penetrated her vagina.

### G. Amber Pierce-Smith

{¶ 46} Amber Pierce-Smith ("Pierce-Smith") testified that she was a sexual assault nurse ("SANE nurse") at MetroHealth, and she performed S.S.'s rape kit on June 2, 2019. According to Pierce-Smith, S.S. "seemed like she was in the right state of mind. She was able to tell me, recall exactly what happened." Pierce-Smith further testified that S.S. "said she was upset. She blamed herself for it happening, this for happening, she just wanted to go home and go to sleep." Pierce-Smith testified from her notes regarding S.S.'s examination that S.S. told her the following about what happened:

> I was at the Barley House on West 6th with a coworker Tiffany. We Ubered there. I had some shots and drinks there, and I got separated from my friend.

Two different guys started dancing with me.  It was around last call.  The second guy took me outside, kept saying I needed to find my friend.  I told the bouncer when I was leaving, don't let me go and touched the bouncer.  The bouncer told me not to touch him.

The guy was on his phone with someone and said, we are ready to come back to the hotel.  Friend and her friend were outside.  He walked to the Renaissance Hotel.  His key card didn't work.  The door was locked.  A bell guy let us in, and we went to the elevator.  He let some people go in front of us, and then we got in the elevator went to the seventh floor.  We took a left, another left, and a right.

He knocked on — he knocked on someone's door and said, we're back.  This guy — this guy — a beard — oh, then this guy with a beard.  My friend Tiffany and her friend and this guy went to his room.

I peed once I got in the room and then laid on the bed.  I felt like I was not in the right state of mind.  Tiffany and Texas left after the guy said something to them.  My phone was ringing * * * and kept saying it will be — it will be fine — it will be like a few minutes.  He focused himself on me and kept telling me to get on top.  He rolled over — he hold me over him but then rolled me — rolled, then rolled me on my back.  He end upped finishing on top of me and said, I am done.  Left the room, went to the elevator, main floor.  Seen my friend's Jeep and got in.  When I was leaving the room he said, my name is Brian if you need to know.  Friend drove me to the police station.  Then police said to come to Metro.

{¶ 47} On cross-examination, Pierce-Smith testified that S.S. did not have any "wounds" on her body when she came to MetroHealth.  Pierce-Smith did not observe any injuries to S.S.'s vaginal area, although "there was some slight redness * * *."  Pierce-Smith further testified that "it's common for [sexual assault survivors] not to have injuries."

{¶ 48} Additionally, the following colloquy took place during Pierce-Smith's direct examination:

Q: And can you give the jury some sense generally of how patients react to having a sexual assault exam?

A: It varies. Some people are angry. Some people are upset. They were, like visibly crying. Some patients just wanted to go home. They just wanted to get the kit over with. You know, everyone — I don't think you can put — everyone got — deals with situations differently. So I feel like there's always a variety of — sometimes patients self blame, why did this happen to me? It's my fault. Like I said, some are angry. There's a variety of emotions.

Q: Would you characterize getting a sexual assault exam done as an easy thing?

A: No. It's definitely not an easy thing. It's very invasive. We're asking you to relive everything that happened by giving us the narrative, and then we're doing a pelvic exam after you've already been sexually assaulted where, you know — so it's very invasive and not something that most people want to do.

### H. Christine Prochaska

{¶ 49} Christine Prochaska ("Prochaska") testified that she was bartending at the Pickle on the night of October 5, 2018, into the "wee hours of October 6th." Prochaska testified that L.W. was at the Pickle that night, sitting at the bar drinking with two males. According to Prochaska, "[t]hey looked like they were friends sitting at the bar just having a good time." Prochaska testified that she did not "cut any of these three people off" from drinking alcohol that night. Prochaska had no trouble communicating with L.W. at the time, and she did not see L.W. "stumbling" or "staggering around." Prochaska testified that L.W. left the bar with these two males. Asked if these two males had to help L.W. walk out of the bar when they left together, Prochaska answered, "Not that I recall. And I think I would have remembered that."

{¶ 50} Prochaska testified that L.W. and one of the males came back to the bar "maybe a half hour, 45 minutes" later. Asked if, when they came back to the bar, L.W. was "now staggering around or unable to stand," Prochaska replied, "No."

Prochaska asked L.W. if she wanted another drink. L.W. replied, "No." Shortly after this, L.W. and the male left the bar again. According to Prochaska, at no point that night did she see L.W. "nodding off or blacking out or anything even close to that."

{¶ 51} Prochaska testified that if she observes a bar patron "not being able to walk out to their vehicle and needing help," she would "definitely cut them off."

## I. Denise Robinson

{¶ 52} Denise Robinson ("Robinson") testified that she is the coordinator of the adult forensic SANE unit at University Hospitals Cleveland Medical Center. According to Robinson, "SANE stands for sexual assault nurse examiner."

{¶ 53} Robinson testified that she was not the nurse who conducted L.W.'s rape kit on October 6, 2018, but she was familiar with L.W.'s medical records. According to Robinson, "Debbie Howard conducted the exam, and I assisted her with some of the paperwork, writing it out." Specifically, Robinson "helped Debbie seal the kit and then fill out the discharge paperwork." Reading from L.W.'s medical records, Robinson testified as follows about L.W.'s responses to various questions:

Q: What was her response to, did finger touch or penetrate?

A: Unknown.

Q: Did object touch or penetrate?

A: Unknown.

Q: And did penis touch or penetrate?

A: Unknown.

* * *

Q: And then, did the assailant ejaculate? * * *

A: Unknown.

Q: And what about, did the assailant wear a condom?

A: Unknown

{¶ 54} Robinson testified that L.W. had eaten, urinated, defecated, drank, and brushed her teeth since the assault but prior to the exam. Robinson testified that, according to L.W.'s medical records, she had some bruising, lacerations, and soreness in her buttocks and thigh area and "tenderness and swelling" in the vaginal and anal area. L.W.'s medical records also show that she reported "pain [in her] vaginal walls."

{¶ 55} Robinson testified as to the narrative account of events that L.W. told Debbie Howard during the rape kit exam. The narrative from the medical records states as follows:

> Oct 5, 2018 [approximately] 10 pm Mike and I went to [a] bar. We had a couple of drinks, I recognized the kid next to me. (Anthony Guzi) We started taking shots. We talked to them (there was Anthony + another young man) Mike got jealous + he left. After that I don't remember, I don't remember getting in their car. I do remember that they said they were gay (Anthony + the other male). I remember waking up in Anthony's bedroom between the two of them, feeling sore in my vaginal area. I still had my clothes on, they were shirtless, but had their boxers on. I asked for my phone they said they didn't know [sic] my phone was. I messaged Anthony to see if he had checked to find my phone. He said he had looked everywhere. I asked him if we had hooked up. He said he + his friend had hooked up with me. Anthony took me home.

{¶ 56} Additionally, the following colloquy took place during Robinson's direct examination:

Q: So, Ms. Robinson, as a SANE nurse who has treated many patients, there's a narrative being put forth by the defense that perhaps this is the easy road for [L.W.]. As a SANE nurse, have you ever encountered a patient who described this process as easy?

A: No.

Q: Would you, as a SANE nurse, describe this process as easy?

A: No.

Q: How would you describe this process?

A: Invasive.

## J. Richard Johnson

{¶ 57} Richard Johnson ("Johnson") testified that he is the digital forensic examiner for the Westlake Police Department. In December 2018, Johnson examined "a pair of phones for the Brecksville Police Department." One of the phones belonged to Kramer-Kelly. Johnson testified that some items from the "web history" of Kramer-Kelly's phone were manually deleted in November 2018.

## K. Detective Christopher Grimm

{¶ 58} Brecksville Police Detective Christopher Grimm ("Det. Grimm") testified that, on the evening of October 6, 2018, he was notified of a sexual assault that occurred. He picked up the completed rape kit from University Hospitals and transferred it to the "[d]ifferent labs" for processing. Det. Grimm interviewed L.W. and Dinallo on October 8, 2018, and he interviewed Kramer-Kelly on November 12, 2018.

## L. Video of Kramer-Kelly's Interview with Detective Grimm

{¶ 59} The recording of Kramer-Kelly's interview with Det. Grimm was played for the jury. Kramer-Kelly stated that he went to the Pickle on October 5, 2018, with Guzi. He met L.W., who went to high school with Guzi, and L.W. was "very intoxicated, drinking a lot. Buying shots for everybody. * * * She looked like a drunk." Kramer-Kelly told Det. Grimm that L.W. told him she drank a bottle of wine prior to arriving at the Pickle that night. Kramer-Kelly estimated that L.W. consumed "15 shots" at the bar and weighed approximately 100 pounds.

{¶ 60} According to Kramer-Kelly, he did not think L.W. was able to drive home. He told Det. Grimm that he was going to drive L.W. home. Kramer-Kelly further stated that L.W. was "grabbing all up on me, kissing me and stuff." Kramer-Kelly put L.W. into the front passenger seat of his car, and Guzi got in the back seat. According to Kramer-Kelly, while he was driving, L.W. unfastened her seatbelt and climbed onto his lap. He pulled his car over to the side of the road and told L.W. to get in the back seat. She did, and according to Kramer-Kelly, L.W. and Guzi started "fooling around," and he was "pretty sure" they had sex in the backseat.

{¶ 61} At some point close to 2:00 a.m., Kramer-Kelly, L.W., and Guzi drove back to the Pickle to look for L.W.'s cell phone. They did not find it, and Kramer-Kelly tried again to drive L.W. home.

{¶ 62} Kramer-Kelly told Det. Grimm that L.W. was so intoxicated that, while he was driving her home, she directed him to the wrong house. Ultimately, L.W. told Kramer-Kelly that she did not know where her house was. Kramer-Kelly

drove L.W. and Guzi to Guzi's house. All three of them got into Guzi's bed. Guzi fell asleep, and L.W. began talking to Kramer-Kelly and "crawling up on" him. According to Kramer-Kelly, L.W. had been "trying this all night" and he could "care less to have sex with [her]." Kramer-Kelly told Det. Grimm that he told L.W., "unless you say you want to or yes, I'm not taking that risk."

{¶ 63} Kramer-Kelly told Det. Grimm that L.W. offered, and he "did receive oral sex from her." The three of them slept from approximately 4:30 a.m. to 8:30 or 9:00 a.m., when Kramer-Kelly and Guzi drove L.W. home. L.W. thanked them for getting her home safely, and he has not seen or talked to her since then. When Det. Grimm asked more about whether he had any communication with L.W., Kramer-Kelly stated that she messaged him about her lost phone the next Tuesday. He messaged her back that he did not know where her phone was.

## III. Law and Analysis

{¶ 64} On appeal, Kramer-Kelly assigns six errors for our review. We begin and end our analysis with the sixth assignment of error, because it is dispositive of this case. In his sixth assignment of error, Kramer-Kelly argues that "the trial court abused its discretion in denying [his] motion for relief from prejudicial joinder." We note that this court renders no opinion as to the merits of Kramer-Kelly's remaining assignments of error.

### A. Joinder/Severance

{¶ 65} Pursuant to Crim.R. 8(A), "[t]wo or more offenses may be charged in the same indictment, * * * if the offenses charged * * * are of the same or similar

character or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." The Ohio Supreme Court has held that "[j]oinder of offenses is favored because it conserves resources by avoiding duplication inherent in multiple trials and minimizes the possibility of incongruous results that can occur in successive trials before different juries." *State v. Hamblin*, 37 Ohio St.3d 153, 157-158, 524 N.E.2d 476 (1988).

{¶ 66} However, pursuant to Crim.R. 14, "[i]f it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment * * * the court shall order * * * separate trial[s] of [the] counts * * *." The Ohio Supreme Court has held that the defendant "bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance." *State v. Brinkley*, 105 Ohio St.3d 231, 2005-Ohio-1507, 824 N.E.2d 959, ¶ 29. The state can refute a defendant's claim of prejudice in one of two ways: "(1) a showing that the evidence of each crime is simple and direct or (2) evidence of the other crimes would be admissible even if the counts were severed." *State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 79. "A defendant is therefore not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B)." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66.

{¶ 67} This court reviews a trial court's denial of a motion to sever under an abuse of discretion standard. *See State v. Schaim*, 65 Ohio St.3d 51, 63, 600 N.E.2d

661 (1992) ("[T]he court abused its discretion in refusing to sever [the offenses], particularly when its reasons for doing so were based on the fact that committing one of these crimes shows a propensity to commit another — an inference that a jury is forbidden to draw.").

{¶ 68} In the case at hand, Kramer-Kelly argues that the charges against him should not have been set forth in a single indictment in violation of Crim.R. 8(A), and, in the alternative, he argues that he was prejudiced by the single indictment in violation of Crim.R. 14.  In both of these arguments, Kramer-Kelly's position is that the charges concerning L.W. should have been tried separately from the charges concerning S.S.

{¶ 69} First, we analyze whether the offenses relating to L.W. "may be charged in the same indictment" as the offenses relating to S.S. under Crim.R. 8(A).  The charges relating to L.W. and the charges relating to S.S. are of the "same or similar character," because Kramer-Kelly was charged with rape and kidnapping concerning both victims.  Upon review, we find that these offenses could be charged in the same indictment under Crim.R. 8(A).  *See, e.g., State v. Zoubaier*, 9th Dist. Summit No. 26049, 2012-Ohio-2888, ¶ 10 (finding that carrying a concealed weapon and having a weapon while under disability charges in two different incidents on two different dates could be tried together under Crim.R. 8(A) because "[n]ot only are they crimes [of] a 'similar character,' they are the same crime[s]").

{¶ 70} Turning to Crim.R. 14, if joinder is proper, a defendant may request relief by showing prejudice.  In the case at hand, Kramer-Kelly argued in the trial

court that he was prejudiced by allowing the offenses concerning L.W. to be tried in the same case as the offenses concerning S.S. for several reasons. First, it forced "him to present separate or even inconsistent defenses." Specifically, that he was unaware of L.W.'s substantial impairment and that the sexual encounter with S.S. was consensual. Second, it restricted his ability to testify in L.W.'s case but not in S.S.'s case. Third, a jury may "apply or accumulate" evidence from L.W.'s case to evidence from S.S.'s case. Fourth, the evidence from either case would be inadmissible in the other case as "bad character" or "propensity" evidence in violation of Evid.R. 404(B), and this will have "a negative impact upon the jurors' feeling about him." Fifth, L.W.'s case was ready to go to trial before the state reindicted him with both cases, and he had to prepare for trial twice. Sixth, there is the likelihood of two trials even if the court were to deny severance, because Guzi, as a codefendant, "will undoubtedly seek a separate trial."

{¶ 71} Upon review, we find that Kramer-Kelly was prejudiced by the single indictment for the third and fourth reasons he sets forth in this appeal. We analyze this prejudice below.

{¶ 72} Next, if a defendant shows prejudice, the state may rebut this in one of two ways: showing that the evidence is simple and direct or showing that "other-acts" evidence would be admissible even if the offenses were severed. We start by analyzing whether evidence from one trial would be admissible at the other trial under Evid.R. 404(B) if the offenses were severed.

### 1. Inadmissible Other-Acts Evidence under Evid.R. 404(B)

{¶ 73} Pursuant to Evid.R. 404(B)(1), "[e]vidence of any other crime, wrong or act is not admissible to prove the person's character in order to show that on a particular occasion the person acted in accordance with the character."

> "A hallmark of the American criminal justice system is the principle that proof that the accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime." *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975), citing 1 Underhill's Criminal Evidence, Section 205, at 595 (6th Ed.1973). That philosophy is premised on our understanding of human nature: the typical juror is prone to "much more readily believe that a person is guilty of the crime charged if it is proved to his satisfaction that the defendant has committed a similar crime." *State v. Hector*, 19 Ohio St.2d 167, 174-175, 249 N.E.2d 912 (1969).

*State v. Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, ¶ 20.

{¶ 74} Although *Hartman* concerns other-acts evidence outside the joinder and severance arena, the offenses at issue in *Hartman* are similar to the offenses at issue in the case at hand. Furthermore, both *Hartman* and the instant case concern sexual assault allegations against two different victims, at two different times, and at two different locations.

> Hartman was accused of raping an adult female acquaintance in her hotel room after they had spent the evening out with a group of friends. He claimed that the hotel encounter was consensual. To counter his claim and support its version of events, the state presented "other acts" evidence that Hartman had sexually abused his stepdaughter when she was a child. A jury found Hartman guilty of the crimes, but the court of appeals reversed, concluding that the other-acts evidence should not have been admitted. We agree and affirm the judgment of the court of appeals.

*Id*. at ¶ 1.

{¶ 75} The *Hartman* Court explained that, although "other acts" evidence is generally inadmissible, it may be admitted "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Evid.R. 404(B)(2).  The court analyzed each of these applicable exceptions and found that evidence that Hartman committed a prior sexual abuse "is precisely the propensity inference that 404(B) forbids" in a subsequent sexual abuse case.  *Hartman* at ¶ 63.

{¶ 76} Applying the Ohio Supreme Court's reasoning in *Hartman* to the case at hand, we find that, had there been separate trials for the offenses concerning L.W. and the offenses concerning S.S., evidence from one trial would be inadmissible at the other trial.  *Hartman* makes clear that "other-acts evidence must be probative of a 'purpose other than the person's character or propensity to behave in a certain way'" to be admissible.  *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 26, quoting *United States v. Gomez*, 763 F.3d 845, 860 (7th Cir.2014).  "Evid.R. 404(B) provides a nonexhaustive list of the permissible nonpropensity purposes for which other-acts evidence may be introduced."  *Hartman* at ¶ 26.

{¶ 77} In the state's "response to motion to sever," filed in the trial court, it argues that the other-acts evidence at issue is admissible to "demonstrate that there is a common scheme, plan, or system, and a lack of mistake or accident."  Specifically, the state argues that "Kramer-Kelly was carousing at a bar, beguiled a victim who was intoxicated, left the establishment with that victim for a more

secluded or private location, and then sexually assaulted each victim when their ability to resist was substantially impaired due to their intoxication."

{¶ 78} The *Hartman* Court rejected a substantially similar argument, holding that evidence regarding Hartman sexually abusing his stepdaughter while she was sleeping was not admissible in a trial alleging that Hartman sexually abused an acquaintance while she was sleeping. "That both crimes were committed against a female sleeping in a bed is hardly unique to Hartman as a perpetrator." *Id*. at ¶ 38.

{¶ 79} As to the common scheme or plan argument, *Hartman* noted that "plan evidence need not share any common characteristics with the current crime; rather, the other acts are linked to the present crime because they are carried out in furtherance of the same overall plan." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 40. The court explained that

> [c]ommon-plan evidence generally concerns events that are "inextricably related" to the crime charged. [*State v.*] *Curry*, 43 Ohio St.2d at 73, 330 N.E.2d 720. The other acts form the "immediate background" of the present crime: they are typically either part of the "same transaction" as the crime for which the defendant is on trial or they are part of "a sequence of events" leading up to the commission of the crime in question.

(Citations omitted.) *Id*. at ¶ 41. The court concluded that "Hartman's alleged assault of his stepdaughter was not part of a larger scheme involving the rape of" the second victim. *Id*. at ¶ 43. The court "stressed" that "plan evidence should show that the crime being charged and the other acts are part of the same grand design by the defendant." *Id*. at ¶ 46.

{¶ 80} Upon review, we find that the evidence concerning L.W. is not part of a "common scheme or plan" that includes the evidence concerning S.S. These two incidents are not "inextricably related" nor are they part of the "same transaction." Kramer-Kelly and Guzi were accused of raping L.W. while she was substantially impaired. Kramer-Kelly alone was accused of forcefully raping S.S. and raping her while she was substantially impaired. The rapes occurred nine months apart in different cities. Accordingly, we reject the state's attempt to introduce other-acts evidence and rebut Kramer-Kelly's showing of prejudice under a "common scheme or plan" theory.

{¶ 81} Turning to the Evid.R. 404(B) exception concerning absence of mistake, the *Hartman* Court likewise rejected arguments substantially similar to the arguments the state makes in the instant case. The court explained this exception as follows: "Other-acts evidence is admissible to negate a defendant's claim of mistake or accident with respect to the commission of the alleged crime; such evidence tends '[t]o show, by similar acts or incidents, that the act in question was not performed inadvertently, accidentally, involuntarily, or without guilty knowledge.'" *Id*. at ¶ 52, quoting McCormick, *Evidence*, Section 190, at 804 (4th Ed.1994).

{¶ 82} In *Hartman*, the "state offered the evidence for purposes of rebutting Hartman's suggestion that even if [the second victim] did not consent to oral sex, he mistakenly thought that she had." *Hartman*, 161 Ohio St.3d 214, 2020-Ohio-4440, 161 N.E.3d 651, at ¶ 54. "Or to put it another way, the other-acts evidence 'must be

so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged.'" *Id*. at ¶ 58, quoting 1 *Wharton's Criminal Evidence* at Section 4:31. "In essence, the state's theory is that because Hartman had previously abused his stepdaughter, it is unlikely that he had consensual sex with" the second victim. *Id*. at ¶ 59.

{¶ 83} The *Hartman* Court concluded that evidence that Hartman sexually abused his stepdaughter "does not support an inference that Hartman entered [the second victim's] hotel room with the intent to rape her while she was intoxicated." *Id*. at ¶ 62. The court further concluded that the state's argument that Hartman "preys on sleeping or impaired women * * * is precisely the propensity inference that Evid.R. 404(B) forbids." *Id*. at ¶ 63.

{¶ 84} We again find that the reasoning in *Hartman* applies to the case at hand. The other-acts evidence at issue — the admissibility of allegations concerning one victim at a trial concerning another victim — would be inadmissible under a mistake or accident theory. We conclude that this constituted improper propensity evidence under Evid.R. 404(B), and prejudiced Kramer-Kelly under Crim.R. 14 at trial.

### 2. The Evidence is Not Simple and Direct

{¶ 85} We now turn to whether the evidence in this case was simple and direct under Crim.R. 14. Ohio courts have held that evidence is simple and direct "if the jury is capable of readily separating the proof required for each offense, if the

evidence is unlikely to confuse jurors, if the evidence is straightforward, and if there is little danger that the jury would 'improperly consider testimony on one offense as corroborative of the other.'" (Internal citations omitted.) *State v. Wright*, 4th Dist. Jackson No. 16CA3, 2017-Ohio-8702, ¶ 52. *See also State v. Palmer-Tesema*, 8th Dist. Cuyahoga No. 107972, 2020-Ohio-907.

{¶ 86} Notwithstanding part of the evidence concerning S.S. in the case at hand, Kramer-Kelly's trial was complex, confusing, and inherently inconsistent.

{¶ 87} There is inconsistent testimony about whether L.W. was substantially impaired that night. L.W. provided no testimony about the allegations of sexual assault. Rather, she testified that she had no recollection about the events that occurred after she left the Pickle. *See State v. Doss*, 8th Dist. Cuyahoga No. 88443, 2008-Ohio-449, ¶ 21 (The victim's "testimony that she does not remember anything about the incident is not evidence that she did not consent to the sexual encounter or that appellant knew that she may have been substantially impaired."). Rivera's testimony about the DNA she extracted and tested from L.W.'s rape kit is not simple and direct and, at best, can be described as inconclusive. Robinson's testimony about the medical records from L.W.'s rape kit established that L.W. may have been sexually assaulted, but there is inconclusive and inconsistent evidence about whether the alleged assailant was Kramer-Kelly,[2] Guzi, or "any other" unidentified male.

---

[2] Kramer-Kelly admitted to Det. Grimm that he received oral sex from L.W. that night, although his DNA was not found on L.W.'s oral swab. The evidence from L.W.'s

**{¶ 88}** Additionally, the state presented the evidence in a nonlinear fashion, first introducing testimony concerning L.W., next introducing testimony concerning S.S., and then returning to testimony concerning L.W. While we are acutely aware that the presentation of witnesses is not always perfect and is generally considered trial strategy, our review of the trial transcript shows that the state gave no roadmap to the jury separating the testimony regarding L.W. from the testimony regarding S.S. *Compare State v. Lewis*, 6th Dist. Lucas Nos. L-09-1224 and L-09-1225, 2010-Ohio-4202, ¶ 33 ("Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof."). In point of fact, this court had a difficult time piecing together who was testifying about whom.

**{¶ 89}** The witnesses and evidence regarding L.W.'s case are not the same witnesses and evidence concerning S.S.'s case. This weighs against trying these cases together from a judicial economy perspective. *Lyndhurst v. Smith*, 8th Dist. Cuyahoga No. 101019, 2015-Ohio-2512, ¶ 29, quoting *Schaim*, 65 Ohio St.3d at 58, 600 N.E.2d 661 ("Joinder of offenses solely because they are of the same or similar character creates a greater risk of prejudice to the defendant, while the benefits from consolidation are reduced because 'unrelated offenses normally involve different times, separate locations, and distinct sets of witnesses and victims.'").

---

vaginal and anal swabs showed the presence of presumptive seminal fluid, but no DNA match was made.

{¶ 90} Upon review, we find that the bootstrapping effect of the evidence in S.S.'s case onto L.W.'s case, which permitted the jury to simultaneously consider the evidence in both alleged rape cases, prejudiced Kramer-Kelly at trial. *See State v. Meeks,* 2015-Ohio-1527, 34 N.E.3d 382, ¶ 125 (5th Dist.) (Hoffman, J., concurring) (When "the charges include sexual allegations * * * the possibility jurors may bootstrap the evidentiary strength of one charge to support a guilty verdict on another charge where the evidence is less persuasive is both real and substantial."). We further find that the state did not refute this showing of prejudice, because the evidence presented was disorderly, inherently inconsistent, and had a high risk of confusing the jury. Additionally, had the trials been severed, evidence concerning L.W. would have been inadmissible at S.S.'s trial, and evidence concerning S.S. would have been inadmissible at L.W.'s trial.

{¶ 91} Accordingly, Kramer-Kelly's sixth assignment of error is sustained. His remaining assignments of error are rendered moot pursuant to App.R. 12(A)(1)(c).

{¶ 92} Judgment reversed, convictions and sentence vacated, and case remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
LISA B. FORBES, JUDGE

MARY J. BOYLE, J., CONCURS;
ANITA LASTER MAYS, A.J., DISSENTS