[Cite as *State v. Wardlaw*, 2025-Ohio-2221.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff- Appellee, | : | |
| | : | No. 114376 |
| v. | : | |
| CHARLES WARDLAW, | : | |
| Defendant-Appellant. | : | |

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 26, 2025

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-675091-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora Bryan, Assistant Prosecuting Attorneys, *for appellee.*

Mary Catherine Corrigan, *for appellant.*

MICHELLE J. SHEEHAN, J.:

{¶ 1} Defendant-appellant, Charles Wardlaw ("Wardlaw"), appeals his convictions for multiple counts of rape, gross sexual imposition, unlawful sexual

conduct with a minor, and solicitation. His convictions arise from unlawful sexual conduct involving three minors: T.M., J.G., and K.S., which is alleged to have occurred intermittently over a period of 20 years. Wardlaw raises the following assignments of error:

1. The appellant's conviction cannot be upheld as the trial court erred by failing to grant the appellant's motion to sever counts.

2. The trial court erred by failing to dismiss the counts relating to KS for preindictment delay.

3. The appellant's conviction(s) cannot be upheld as it is against the manifest weight of the evidence.

4. The trial court erred by permitting the state of Ohio to play JG's video statement made to CCDCFS.

5. The trial court erred in convicting the appellant of the sexually violent predator specifications.

{¶ 2} Based upon our review of the record, we affirm Wardlaw's convictions. Specifically, we find assignments of error Nos. 1 and 2 lack merit because Wardlaw failed to demonstrate that he suffered actual prejudice due to either the joinder of these offenses or from the preindictment delay relating to K.S. We further find that the State met its burden of persuasion in these matters and, therefore, Wardlaw's convictions were not against the manifest weight of the evidence. The trial court also did not abuse its discretion in allowing the videotaped interview of J.G. at trial because the interview was conducted for medical diagnosis and treatment. We further find that there was sufficient evidence supporting Wardlaw's classification as a sexually violent predator.

**{¶ 3}** Accordingly, Wardlaw's five assignments of error are overruled, and we affirm his convictions.

## I. Procedural History, Trial, and Sentencing

### A. Procedural History

**{¶ 4}** In March 2023, Wardlaw was indicted on two counts of rape, one count of gross sexual imposition, and two counts of unlawful sexual conduct with a minor involving T.M.; two counts of rape, two counts of gross sexual imposition, and one count of solicitation involving J.G.; and one count of gross sexual imposition involving K.S. Sexually violent predator specifications pursuant to R.C. 2971.01 were also included in the indictment. Wardlaw pleaded not guilty on all counts.

**{¶ 5}** Relevant to this appeal, Wardlaw timely filed pretrial motions requesting the trial court to sever the counts of the indictment under Crim.R. 14 and to dismiss Count 1 of the indictment relating to K.S. due to preindictment delay. Both motions were argued before the trial court and denied. Wardlaw timely renewed these motions during trial preserving these issues for appeal.

### B. Relevant Trial Evidence

**{¶ 6}** In August 2024, this matter proceeded to trial before a jury. The evidence at trial consisted of live witness testimony including detailed testimony from T.M., J.G., and K.S. Several recorded interviews with Wardlaw, J.G., and child-protection specialist Stephanie Moore ("Moore") were also admitted and played for the jury. In general, the State presented its evidence organized by the allegations made by T.M., J.G., and K.S. and concluded with testimony by law enforcement

summarizing their investigations that led to Wardlaw's indictment. Expert witness testimony was also introduced regarding the analysis and results of DNA testing relevant to T.M.

**1. T.M.**

{¶ 7} In January 2019, T.M. was 13 years old and in eighth grade. She attended school with J.G. T.M and J.G. were best friends. T.M. also lived in the same apartment complex as Wardlaw, who was J.G.'s stepfather. At this time, Wardlaw and J.G.'s mother were separated, but J.G. continued to spend time and stay with Wardlaw at his apartment.

{¶ 8} On January 5, 2019, T.M. and J.G. arranged to have a sleepover at Wardlaw's apartment. T.M. and J.G. frequently spent the night at each other's homes, but this was the first time they spent the night at Wardlaw's apartment. T.M. and J.G. arrived at Wardlaw's apartment in the early evening. They testified that Wardlaw told them they could have alcohol and marijuana, and they all drank and smoked together until Wardlaw left for work shortly before midnight.

{¶ 9} Wardlaw returned home from work sometime during the middle of the night. T.M. testified that she and J.G. were still drinking and smoking while T.M. was flat ironing J.G.'s hair in the bathroom. Wardlaw and the girls then continued to drink and smoke together.

{¶ 10} At some point during the night, T.M. testified that Wardlaw asked the girls to come into his bedroom and watch a movie. T.M. did not want to go into the bedroom, but J.G. asked her to because she did not want to go alone. The girls went

to the bedroom, and Wardlaw put on a movie for them to watch. J.G. fell asleep. T.M. tried to wake her, but Wardlaw told her to leave her alone and to come over by him. Wardlaw then turned off the television and put on music.

{¶ 11} Wardlaw started to touch and kiss T.M.'s neck and arms. Wardlaw started to rub her and tried to take her pants off. T.M. tried to keep her pants on but eventually gave up fighting him. Wardlaw started to "dry hump" her from behind.

{¶ 12} Wardlaw then rolled T.M. over and got on top of her. He started to dry hump her again. Wardlaw kept asking her if she liked it, and she would nod yes because she was scared. T.M. testified that Wardlaw had his hand over her mouth and had another arm holding her down.

{¶ 13} T.M. testified that Wardlaw inserted the tip of his penis into her vagina, but it hurt. She started to make noise due to the pain. He stopped. He did, however, continue to rub her and "dry hump" her.

{¶ 14} T.M. told Wardlaw she needed to go to the bathroom. When she went to the bathroom, she grabbed her belongings and ran out of the apartment. T.M. went home and immediately took a shower because she felt disgusting. She also tried calling and messaging her mother asking her where she was and to come home. After her shower, T.M. got into her mother's bed and cried.

{¶ 15} T.M.'s mother testified that she had spent the night at her boyfriend's apartment. She further testified that when she woke up, she saw the missed calls and messages from T.M. She went home immediately and found T.M. crying in her bed.

{¶ 16} T.M.'s mother asked T.M. what was wrong but did not get an immediate answer. T.M.'s mother testified that she then called Wardlaw to ask what had happened and he responded that he did not rape her daughter. T.M. then reported to her that Wardlaw had forced himself on her.

{¶ 17} T.M.'s mother took her to the emergency room where T.M. was examined, and a rape kit was collected by a sexual assault nurse examiner. The forensic scientists from the Ohio Bureau of Criminal Investigation who conducted the analysis of the specimens from the rape kit testified that Wardlaw's DNA was present on T.M.'s neck, cheek, and on the front and back panels of her underwear.

{¶ 18} In his statements to the Euclid Police Department ("EPD"), Wardlaw provided three separate versions regarding the alleged incident with T.M. In his first statement, dated January 6, 2019, Wardlaw stated that he did not touch T.M. at all and she was gone when he woke up in the morning. On January 17, 2019, Wardlaw called the EPD and amended his statement to say that he woke up to T.M. masturbating him and he kicked her out of the apartment. On March 7, 2019, Wardlaw again called the EPD and stated that T.M. slid under the bed sheets and started grabbing his penis. He told her to stop, or he would tell her mom. T.M. then went to the other room but did not leave.

{¶ 19} In February, 2019, T.M. and her mother moved to Baltimore, Maryland and eventually to Germany where T.M. and her family live to date.

**2. J.G.**

{¶ 20} J.G. is Wardlaw's stepdaughter. J.G. met Wardlaw when she was two years old. Wardlaw and J.G.'s mother later married, and J.G. lived with Wardlaw starting when she was six or seven years old. She testified that Wardlaw was a father figure to her and that she cared for him. Wardlaw and J.G.'s mother had one child together, J.G.'s younger brother.

{¶ 21} J.G. testified that when she was approximately 12 years old and in the seventh grade, Wardlaw started doing things that made her uncomfortable. The first time he made her feel uncomfortable, she and her younger brother were watching a movie with Wardlaw in his bed. Her brother fell asleep. Wardlaw started thrusting his penis on her backside. Wardlaw's clothes were on, but J.G. could feel his hard penis against her back.

{¶ 22} She also testified that Wardlaw frequently offered to pay her and her brother money or to buy them stuff if they rubbed his feet. Then, after her brother would leave the room, J.G. stated that Wardlaw would ask her to do other things. She testified that he asked her numerous times to touch his penis with her hands until he ejaculated. J.G. would do it because Wardlaw would buy her things or get her out of trouble with her mother.

{¶ 23} J.G. testified that on numerous occasions, Wardlaw would slide his penis in between her legs while both of them had their pants off. She testified that

his penis touched her vagina but did not go inside and Wardlaw would ejaculate. Again, J.G. testified that she would do these things to get out of trouble or so that Wardlaw would buy her things.

{¶ 24} J.G. further testified that on one occasion when she was 12 and in seventh grade, Wardlaw put his penis in her mouth until he ejaculated.

{¶ 25} J.G. also testified that Wardlaw once put a note under her bedroom door stating, "If you make daddy come, I'll give you ten dollars."

{¶ 26} J.G. testified that after Wardlaw moved out, these things stopped for a while. Sometime later, Wardlaw started asking her to touch his penis with her hands again. This only happened a few times at Wardlaw's apartment.

{¶ 27} J.G. testified that at the beginning of her freshmen year of high school, she texted Wardlaw that she was upset that he did these things and she did not understand why he did them. She said Wardlaw ultimately said he was sorry, and he had never done that before. After he apologized, there were no more incidents.

{¶ 28} In May 2022, J.G. disclosed to her mother what Wardlaw had been doing to her. J.G. had previously told two friends about the abuse, and both friends testified that they told her to tell her mom, but J.G. did not feel comfortable disclosing the abuse at that time. Later, J.G. told her aunt about the abuse and she encouraged J.G. to tell her mom. After J.G. told her mother, the two of them went to the EPD and reported Wardlaw.

{¶ 29} J.G. testified that she did not previously disclose Wardlaw's abuse for many reasons, including that she was scared, did not want to hurt her family, did not want to take her brother's father away from him, and did not think her mother would believe her and because she cared about the defendant and did not want to get him into trouble.

**3. K.S.**

{¶ 30} K.S. is the biological daughter of Wardlaw. Wardlaw and her mother were never married, and K.S. never resided with Wardlaw. K.S. did, however, sporadically visit Wardlaw when she was younger.

{¶ 31} In 1999, K.S. was five years old. She was with Wardlaw and his then girlfriend Chyna. K.S., Wardlaw, and Chyna went to dinner together and then came back to Wardlaw's apartment. K.S. was in the living room watching television when she heard an abnormal noise coming from the bedroom. When she went to the bedroom to see what it was, K.S. testified that she saw Wardlaw and Chyna engaged in intercourse with a video camera set up to record. K.S. testified that Wardlaw did not ask her to leave but K.S. left the room. After this encounter, K.S. testified that Chyna left the apartment.

{¶ 32} Later that evening, K.S. was watching television in Wardlaw's bed and fell asleep. She testified that she woke up to find Wardlaw's hand in her pants touching her vagina. He stopped when she woke up and acted like nothing happened.

{¶ 33} K.S. called her mother and asked her to come pick her up. When they were in the car, K.S. told her mother what Wardlaw had done. After that, she did not see Wardlaw again until she was 18 or 19 years old.

{¶ 34} In 2008, K.S. and her mother moved to Atlanta, Georgia. In 2012, K.S. testified that Wardlaw's then wife, J.G.'s mother, called her to let K.S. know she had a half-brother. K.S. wanted to have a relationship with him so she traveled to Cleveland to meet him.

{¶ 35} This visit was the first time she saw Wardlaw since the incident. When questioned as to why she did not disclose Wardlaw's abuse, she testified that she was trying to look past it and that she was young and did not really understand what had happened. She also stated that she wanted to move on, forgive Wardlaw, and get to know her brother.

{¶ 36} After this meeting, she did not keep in touch with Wardlaw. But she did keep in touch with Wardlaw's wife so that she could talk with her younger brother. She further stated that she was friendly with J.G. but did not keep in touch with her.

{¶ 37} In May 2022, K.S. testified that she got a frantic phone call from J.G.'s mother. When J.G.'s mother told K.S. what Wardlaw had done to J.G., she disclosed that Wardlaw had done the same thing to her too. Subsequently, K.S. received a phone call from the EPD and K.S. advised them of what Wardlaw had done to her..

### C. Verdict, Sentencing, and Sexually Violent Predator Specifications

{¶ 38} At the conclusion of the trial, the jury returned a verdict of guilty on all counts. Wardlaw waived his right to a jury trial regarding whether he qualified as a sexually violent predator. At the subsequent hearing, the parties agreed to adopt the entire trial testimony and all exhibits from both the State and defense that were admitted at trial and called no further witnesses. After hearing arguments from counsel, the trial court classified Wardlaw as a sexually violent predator under R.C. 2971.01(H)(2)(a), (c), and (f). Wardlaw was sentenced to life in prison with the first chance of parole after 59 years.

## II. Assignment of Error No. 1 – Joinder & Severance

{¶ 39} Wardlaw's first assignment of error asserts that the trial court erred in failing to sever the counts of the indictment due to prejudicial joinder under Crim.R. 14. Specifically, Wardlaw argues that a separate trial should have been held regarding each victim. He also contends that the initial joinder of offenses under Crim.R. 8(A) was inappropriate. We find, however, that the counts were properly joined in a single indictment under Crim.R. 8(A) because they were of same or similar character and that Wardlaw failed to demonstrate that he suffered actual prejudice by the joinder as required by Crim.R. 14. Therefore, this assignment of error is overruled.

### A. Standard of Review

{¶ 40} "We review the trial court's decision on joinder for an abuse of discretion." *State v. Lee*, 2017-Ohio-1449, ¶ 15 (8th Dist.), citing *State v. Dean*, 2015-Ohio-4347, ¶ 58. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 2021-Ohio-3304, ¶ 35. "The defendant "bears the burden of proving prejudice and of proving that the trial court abused its discretion in denying severance."" *Lee* at ¶ 15, quoting *Dean* at ¶ 60, quoting *State v Brinkley*, 2005-Ohio-1507, ¶ 29.

### B. Joinder of Offenses Under Crim.R. 8(A)

{¶ 41} Crim.R. 8(A) governs the joinder of offenses in a single indictment. Crim.R. 8(A) provides:

> Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct.

If the requirements of Crim.R. 8(A) are satisfied, joining multiple offenses in a single trial is favored because it conserves judicial resources, lessens the inconvenience to witnesses, and minimizes the possibility of inconsistent results before different juries. *State v. Anderson*, 2017-Ohio-931, ¶ 23 (8th Dist.), quoting *State v. Torres*, 66 Ohio St.2d 340 (1981). Further, joinder is to be "liberally permitted." *State v. Schaim*, 65 Ohio St.3d 51, 58 (1992).

{¶ 42} Pursuant to Crim.R. 8(A), this court has consistently affirmed the joinder of multiple offenses arising from unlawful sexual conduct such as rape and gross sexual imposition involving multiple victims including minors because they are of the "same or similar character." *See, e.g., State v. Kramer-Kelly*, 2023-Ohio-1031, ¶ 66 (8th Dist.) (rape and kidnapping of two unrelated victims on separate dates); *State v. Salti*, 2019-Ohio-149, ¶ 52 (8th Dist.) (rape and kidnapping of eight unrelated victims over a period of two years); *State v. Hernandez*, 2018-Ohio-738, ¶ 37 (8th Dist.) (rape, kidnapping and gross sexual imposition of two minors); *State v. Belle*, 2019-Ohio-787, ¶ 23 (8th Dist.) (rape and kidnapping of three minors over a period 15 years). Accordingly, we find that the initial joinder in this matter to be proper.

**C. Severance Under Crim.R. 14**

{¶ 43} In turn, Crim.R. 14 provides relief from a prejudicial joinder. Crim.R. 14 states:

> If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants or provide such other relief as justice requires.

{¶ 44} Thus, under Crim.R. 14, a defendant may move to sever the charges against him. "While there is always the possibility of prejudice from joinder of offenses, once the state has concluded its case, the defendant bears the burden of demonstrating actual prejudice from the joinder." *State v. Cisternino*, 1994 Ohio

App. LEXIS 4856, *5 (8th Dist. Oct. 27, 1994), citing *State v. Williams*, 1 Ohio App.3d 156, 159 (10th Dist. 1981); *State v. Strobel*, 51 Ohio App.3d 31, 32-33 (3d Dist. 1988).

{¶ 45} Specifically, the defendant must affirmatively show that his rights were prejudiced. *Torres,* 66 Ohio St.2d at syllabus. The defendant "must show 'compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.'" *State v. Allen*, 2010-Ohio-4644, ¶ 57 (5th Dist.), quoting *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005). A defendant seeking severance must provide the trial court "'sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial.'" *State v. Hand*, 2006-Ohio-18, ¶ 166, quoting *Torres* at 343.

{¶ 46} If the defendant successfully establishes prejudice from joinder, then the burden shifts to the State to rebut the showing of prejudice in one of two ways. *State v. Jackson,* 2015-Ohio-4274, ¶ 13 (8th Dist.). Specifically, the State may rebut defendant's showing of prejudice by satisfying either the "joinder test" or the "other acts test." *State v. Miller*, 2023-Ohio-1141, ¶ 80 (8th Dist.), citing *State v. Lott*, 51 Ohio St.3d 160, 163 (1990). The "joinder test" is satisfied when the evidence presented at trial is "simple and direct." *Belle*, 2019-Ohio-787, at ¶ 24-25 (8th Dist.). "'Simple and direct evidence' means the evidence of each crime is 'so clearly separate and distinct as to prevent the jury from considering evidence of one crime as corroborative as the other.'" *Id*. at ¶ 25, quoting *State v. Quinones*, 2005-Ohio-6576, ¶ 48 (11th Dist.). "Evidence is 'simple and direct' if the trier of fact is capable of

segregating the proof required for each offense." *Id.*, citing *State v. Gravely*, 2010-Ohio-3379, ¶ 39 (10th Dist.).

{¶ 47} "'The purpose of the "joinder test" is to prevent the finder of fact from confusing the offenses.'" *Belle* at ¶ 25, quoting *State v. Varney*, 2008-Ohio-5283, ¶ 19 (4th Dist.). Nonetheless, "a trier of fact is believed capable of segregating the proof of multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 2014-Ohio-5341, ¶ 33 (8th Dist.), citing *Torres* at 343-344. Thus, "'Ohio appellate courts routinely find no prejudicial joinder where the evidence is presented in an orderly fashion as to the separate offenses or victims without significant overlap or conflation of proof.'" *State v. Echols*, 2015-Ohio-5138, ¶ 16 (8th Dist.), quoting *State v. Lewis*, 2010-Ohio-4202, ¶ 33 (6th Dist.).

{¶ 48} In turn, the "other acts" test is satisfied when the State shows that the evidence of the other offenses would have been admissible under Evid.R. 404(B) as "other acts" if the matters had been tried separately. *Lott* at 163. For example, "under Evid.R. 404(B), evidence of other "bad acts" is admissible to establish, among other things, the defendant's identity, preparation, or plan. Evidence of other "bad acts" establishing a defendant's modus operandi may also be used to identify the defendant." *Salti*, 2019-Ohio-149, at ¶ 53 (8th Dist.). However, "when the evidence is 'simple and direct' an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of the crimes as other acts under Evid.R. 404(B)." *Miller* at ¶ 20, quoting *Lott* at 163. Consequently, "[i]f the state can meet

the [requirements of] the joinder test, it need not meet the requirements of the stricter 'other acts' test." *State v. Franklin*, 62 Ohio St.3d 118, 122 (1991).

**C.  The Trial Court Did Not Abuse Its Discretion in Failing to Sever the Counts of Wardlaw's Indictment**

{¶ 49} In his brief, Wardlaw argues that "the facts and circumstances surrounding the underlying allegations in the instant matter indicate that [he] could only receive a fair trial if each incident were tried separately." More specifically, he contends that severance is necessary because the crimes are separated in time, modus operandi, age, and relationship of the victims and the events themselves are "extremely different." Wardlaw, however, does not articulate how he was actually and specifically prejudiced by these "facts." Wardlaw's conclusory and speculative arguments are not sufficient to demonstrate prejudice by joinder. *See, e.g., State v. Porcher*, 2011-Ohio-5976, ¶ 2 (2d Dist.) (conclusory allegations of prejudice insufficient); *Gravely*, 2010-Ohio-3379, at ¶ 36 (10th Dist.) (speculative arguments of prejudice insufficient); *Torres*, 66 Ohio St.2d at 344 (speculative arguments of prejudice insufficient).

{¶ 50} Further, even if Wardlaw had demonstrated actual prejudice, the State has successfully rebutted any prejudice under the joinder test. A thorough review of the trial transcript in this matter demonstrates that the State presented its evidence in an orderly fashion that could be easily understood by the jury. The State first presented the evidence involving T.M., then the evidence involving J.G., and then followed with the evidence involving K.S. The State concluded its evidence by

introducing the interrelated evidence explaining the timing of disclosures by T.M., J.G., and K.S. and the investigation conducted by law enforcement after these disclosures. While we recognize some witness testimony necessarily overlapped due to the facts of this case, the record does not demonstrate that this overlap was significant or resulted in such confusion to the jury that it would impair their ability to properly segregate the proof relating to each victim and the corresponding charges in this case.

{¶ 51} Wardlaw also argues that this court's decision in *State v. Kramer-Kelly,* 2023-Ohio-1031 (8th Dist.), requires us to reverse the trial court's decision. We disagree. In *Kramer-Kelly*, this court reversed the trial court's denial of defendant's motion for severance because the State could not rebut Kramer-Kelly's showing of prejudice by either the other acts or joinder test. *Id.* at ¶ 80, 84, and 90. Notably, and contrary to Wardlaw's assertion in his brief, the *Kramer-Kelly* Court concluded that the initial joinder of the underlying offenses was proper under Crim.R. 8(A). *Id.* at ¶ 69. Additionally, and in contrast to the present matter, Kramer-Kelly clearly articulated six specific and separate bases for finding prejudice due to joinder. *Id.* at ¶ 70-71. The *Kramer-Kelly* Court agreed that defendant was prejudiced based upon these arguments. *Id.* at ¶ 71.

{¶ 52} Accordingly, the *Kramer-Kelly* Court then addressed whether the State had successfully rebutted the prejudice by either the joinder or other acts test. *Id.* at ¶ 72. The court first addressed the other acts test. *Id.* at ¶ 73. While *Kramer-Kelly* involved two separate rapes involving two victims, the facts relating to those

rapes were drastically different from the present matter. *Kramer-Kelly* involved rapes of two adult women unknown to each other and occurring on separate occasions. *Id.* at ¶ 2. Kramer-Kelly's defense to each incident was different and included substantial impairment from alcohol and consent. *Id.* at ¶ 70. Based on these facts, the *Kramer-Kelly* Court concluded that evidence from each offense would not be admissible as "other acts" and, thus, the State did not satisfy the other acts test. *See generally id.* at ¶ 73-84.

{¶ 53} The *Kramer-Kelly* Court then concluded that the State also failed to satisfy the joinder test. *Id.* at ¶ 85-90. The *Kramer-Kelly* Court specifically found "the Kramer-Kelly's trial was complex, confusing, and inherently inconsistent." *Id.* at ¶ 86. Further, the *Kramer-Kelly* Court found that the State presented its evidence in a nonlinear fashion providing "no roadmap to the jury separating the testimony" regarding witnesses, the witnesses would not be the same in both matters, and the DNA evidence in the matter was overly complicated. *Id.* at ¶ 87-89.

{¶ 54} As set forth above, the State's presentation in this matter satisfied the simple and direct test and Wardlaw did not provide us with any arguments that would lead us to conclude otherwise. Accordingly, the trial court did not abuse its discretion in failing to sever the counts against Wardlaw. This assignment of error is overruled.

## III. Assignment of Error No. 2 — Preindictment Delay

{¶ 55} In his second assignment of error, Wardlaw argues that his right to due process was violated by the trial court's failure to dismiss Count 1 of the

indictment for gross sexual imposition relating to K.S. due to preindictment delay. The incident involving K.S. and Wardlaw occurred sometime between 1999 and 2001 when she was five or six years old. K.S. did not report the incident to the police until 2022. Wardlaw alleges that this delay caused him to suffer actual prejudice because he no longer has access to his employment records, housing records, and cell phone records and due to the unavailability of a witness known as Chyna. Based upon the record before us, however, we find that Wardlaw failed to demonstrate actual prejudice from the delay and, specifically, the exculpatory value of this lost evidence. Therefore, we overrule this assignment of error.

## A. Standard of Review

{¶ 56} We review a trial court's decision to grant or deny a motion to dismiss on the grounds of preindictment delay for an abuse of discretion. *Miller*, 2021-Ohio-1878, at ¶ 23 (8th Dist.), quoting *State v. Darmond*, 2013-Ohio-966, ¶ 33. An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson*, 2021-Ohio-3304, at ¶ 35. Further, "'[c]ourts reviewing a decision on a motion to dismiss for pre-indictment delay accord deference to the lower court's findings of fact but engage in a de novo review of the lower court's application of those facts to the law.'" *Miller* at ¶ 23, quoting *State v. Henley*, 2006-Ohio-2728, ¶ 7 (8th Dist.); *see also State v. Jones*, 2024-Ohio-1588, ¶ 45 (8th Dist.) ("In reviewing a trial court's ruling on a motion to dismiss for preindictment delay, we apply a de novo standard of

review to issues of law but afford great deference to the trial court's findings of fact.").

## B. Preindictment Delay Under Ohio Law

{¶ 57} Preindictment delay generally refers to the time between the commission of a crime by a defendant and the filing of formal charges by the prosecution against the defendant for that crime. The United States Supreme Court has "determined that a defendant is protected against any prejudice that may result from the time delay between the alleged incident and indictment by the statute of limitations." *State v. Anderson*, 2022-Ohio-1313, ¶ 11 (8th Dist.), citing *State v. Cruz*, 2019-Ohio-768, ¶ 10 (8th Dist.), citing *U.S. v. Marion*, 404 U.S. 307, 322 (1971). Indeed, it is the statute of limitations for a crime that provides the "'primary guarantee against bringing overly stale criminal charges.'" *State v. Wade*, 2008-Ohio-4574, ¶ 45 (8th Dist.), quoting *Henley* at ¶ 5, citing *United States v. Lovasco*, 431 U.S. 783, 789 (1977).

{¶ 58} However, preindictment delay may still violate a defendant's due process rights despite the State's initiation of prosecution within the statutorily defined period when the delay causes actual prejudice to the defendant and is unjustifiable. *Jones,* 2024-Ohio-1588, at ¶ 41 (8th Dist.), quoting *State v. Jones*, 2016-Ohio-5105, ¶ 12; *see also State v. Luck*, 15 Ohio St.3d 150, paragraph two of the syllabus (1984). Consequently, the Ohio Supreme Court has "firmly established a burden-shifting framework for analyzing a due process claim based on preindictment delay." *Jones,* 2016-Ohio-5105, at ¶ 13. Under this framework,

"[o]nce a defendant presents evidence of actual prejudice, the burden shifts to the state to produce evidence of a justifiable reason for the delay." *Id.*, citing *State v. Whiting*, 84 Ohio St.3d 215, 217 (1998); *State v. Adams*, 2015-Ohio-3954, ¶ 99.

{¶ 59} The burden is on the defendant to prove preindictment delay violated their due process rights. *State v. Bourn*, 2022-Ohio-4321, ¶ 18. Courts have routinely noted that this burden is "nearly insurmountable." (Cleaned up.) *Id.* Moreover, "prejudice is not presumed solely due to a lengthy delay." *State v. Copeland*, 2008-Ohio-234, ¶ 14 (8th Dist.). "The possibility that memories will fade, witnesses will become inaccessible, or evidence will be lost is not sufficient to establish actual prejudice." *Jones,* 2016-Ohio-5105, at ¶ 21, quoting *Adams* at 105. "Those are the real possibilities of prejudice inherent in any extended delay and the statutes of limitations sufficiently protect against them." *Id.,* citing *Marion* at 326.

{¶ 60} Further, "speculative claims of prejudice or vague assertions of prejudice are insufficient to meet a defendant's burden." *Jones,* 2024-Ohio-1588 (8th Dist.), at ¶ 44, citing *Jones*, 2016-Ohio-5105, at ¶ 27. Rather, actual prejudice exists when "the missing evidence or unavailable testimony would have minimized or eliminated the impact of the state's evidence and bolstered the defense." *Bourn* at ¶ 18, citing *Jones,* 2016-Ohio-5105, at ¶ 28, citing *Luck* at 157-158. As the Ohio Supreme Court recognized in *Bourn*, "the use of the word 'would' in the *Jones* decision is significant. It is not enough for a defendant to show that the missing evidence or unavailable testimony 'could' or 'may' help the defendant. Instead, the defendant must show that the evidence or testimony *would* help the defendant."

(Emphasis in original.) *Id.* at ¶ 17. "'[A] defendant must show, by concrete proof, the exculpatory value of any alleged missing evidence.'" *Wade*, 2008-Ohio-4574, at ¶ 48 (8th Dist.), quoting *State v. Robinson*, 2008-Ohio-3498, ¶ 121 (6th Dist.), citing *State v. Gulley*, 1999 Ohio App. LEXIS 6091, *8 (12th Dist. Dec. 20, 1999), citing *United States v. Doerr*, 886 F.2d 944, 964 (C.A.7 1989). In conclusion, it is clear under established precedent that the "'defendant must show how the lost witnesses and physical evidence would have proven the defendant's asserted defense.'" *Id.* at ¶ 48, quoting *Robinson* at ¶ 121.

## C. The Trial Court Did Not Abuse Its Discretion in Denying Wardlaw's Motion to Dismiss Count 1 Due to Preindictment Delay

{¶ 61} Wardlaw contends that he has suffered actual prejudice on several grounds: (1) employment records are no longer available; (2) apartment lease records and surveillance video are no longer available; (3) cell phone records are no longer available; and (4) his inability to locate a lost witness known as Chyna. He fails, however, to articulate the exculpatory value of this lost evidence or, in other words, how this evidence would prove his defense against the allegations raised by K.S. Rather, Wardlaw only asserts that this evidence *may* have helped him investigate and build an alibi defense.

{¶ 62} While we recognize Wardlaw's difficulty in providing an "alibi" to K.S.'s allegations where the timeframe for the offense cannot be narrowed to a specific day and time, we conclude that Wardlaw has not met his burden in establishing actual prejudice due to the preindictment delay in this matter. As to his

employment records, Wardlaw has not asserted that he was at work during the time of the offense or exactly how his employment records would benefit him.

{¶ 63} Regarding apartment records, it is also unclear what the exculpatory value is of where Wardlaw lived at the time of the alleged offense, nor does he attempt to establish actual prejudice from the unavailability of these records. Similarly, Wardlaw does not show how his past telephone records would have proven his defense to K.S.'s allegations.

{¶ 64} As to the lost witness, Chyna, K.S. testified that Chyna was not present during the incident with Wardlaw. Moreover, during arguments before the trial court as well as at oral argument, counsel for Wardlaw conceded that they had no idea what Chyna would say if she were available, and she may in fact be more helpful to the State. On these facts, we cannot conclude that Wardlaw suffered any actual prejudice due to her absence.

{¶ 65} Because we find Wardlaw's arguments to be purely speculative and do not constitute actual prejudice, the trial court did not abuse its discretion in failing to dismiss Count 1 of the indictment due to preindictment delay regarding K.S. This assignment of error is overruled.

## IV. Assignment of Error No. 3 — Manifest Weight

{¶ 66} Wardlaw's third assignment of error claims that his convictions are not supported by the manifest weight of the evidence. Wardlaw attacks his convictions on three bases: lack of credible evidence, lack of corroborating evidence,

and inconsistent witness statements. Based on the record, we find that each of Wardlaw's arguments lack merit. This assignment of error is overruled as well.

## A. Standard of Review

{¶ 67} "A manifest weight challenge questions whether the State has met its burden of persuasion." *State v. Harris,* 2020-Ohio-1497, ¶ 28 (8th Dist.), citing *State v. Thompkins*, 78 Ohio St.3d 380, 390 (1997). "[W]eight of the evidence addresses the evidence's effect of inducing belief. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's." *State v. Wilson*, 2007-Ohio-2202, ¶ 25, citing *Thompkins* at 386-387. A manifest weight challenge raises factual issues and our review is as follows:

> "'The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'"

*Harris* at ¶ 28, quoting *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "The use of the word 'manifest' in the standard of review 'means that we can only reverse the trier of fact if its decision is very plainly or obviously contrary to the evidence.'" *Id.*, quoting *State v. Hernandez*, 2018-Ohio-5031, ¶ 20 (8th Dist.).

**B. Wardlaw's Convictions Are Not Against the Manifest Weight of the Law**

**1. Inconsistent Witness Statements**

{¶ 68} The record demonstrates instances where T.S. and J.G. made inconsistent statements regarding the facts and circumstances relevant to their allegations of abuse by Wardlaw. Nonetheless, "inconsistencies or contradictions in a witness's testimony do not entitle a defendant to a reversal of trial." *State v. Rentas*, 2024-Ohio-732, ¶ 16 (8th Dist.). Moreover, "'a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory.'" *State v. Solomon*, 2021-Ohio-940, ¶ 62 (8th Dist.), quoting *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 40 (8th Dist.). "'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'" *State v. Mann*, 2011-Ohio-5286, ¶ 37 (10th Dist.), quoting *State v. Nivens*, 1996 Ohio App. LEXIS 2245, *7 (10th Dist. Mar. 28, 1996).

{¶ 69} In *Rentas*, this court referenced the Tenth District's opinion in *State v. R.I.H.*, 2019-Ohio-2189 (10th Dist.), to conclude that inconsistent witness statements do not amount to a manifest miscarriage of justice. *Rentas* at ¶ 16. Specifically, the *Rentas* Court noted that "portions of a victim's trial testimony that were inconsistent with prior statements to police did not amount to a finding of a manifest miscarriage of justice where the jury was aware of such inconsistency and

was able to consider this when weighing the credibility of the testimony." *Rentas* at ¶ 16, citing *R.I.H.* at ¶ 41.

{¶ 70} Similar to *R.I.H.*, the jury in this case was made aware of the inconsistent prior statements regarding the incidents involving Wardlaw. Both J.G. and T.M. testified at length regarding Wardlaw's abuse, and the jury also viewed Wardlaw's conflicting police interviews. The jury was in the best position to weigh the credibility of the witnesses' testimony, and we do not find that they lost their way in finding T.M. and J.G. to be credible witnesses.

### 2. Lack of Corroborating Evidence

{¶ 71} Wardlaw's objections resting on the lack of corroborating evidence also lack merit. Specifically, it is well established in this court that "a rape conviction obtained without corroborative evidence does not necessarily render the conviction against the manifest weight of the evidence." *State v. Peterson*, 2024-Ohio-2903, ¶ 15 (8th Dist.), citing *State v. Wilk*, 2022-Ohio-1840, ¶ 63 (8th Dist.). Stated otherwise, "[a] victim's testimony alone is sufficient to sustain a conviction; there is no requirement that a rape victim's testimony be corroborated." *Id.*, citing *State v. McSwain*, 2017-Ohio-8489, ¶ 34 (8th Dist.), citing *State v. Blakenship*, 2001 Ohio App. LEXIS 5520, *11 (8th Dist. Dec. 13, 2001). As previously stated, K.S., J.G., and T.M. each provided detailed testimony regarding Wardlaw's abuse and their testimony alone is sufficient to support his convictions.

### 3. Lack of Credible Evidence

{¶ 72} Reviewing the entire record, we cannot conclude that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Notably, T.M., J.G., and K.S. provided detailed testimony regarding the abuse. Wardlaw's inconsistent statements to law enforcement regarding the incident with T.M. were introduced at trial as well as testimony indicating that Wardlaw's DNA was present on T.M.'s cheek, neck, and underwear. Close friends and family of J.G. also testified regarding her disclosure of Wardlaw's abuse to them. The record in this case simply does not present us with facts demonstrating that this is an exceptional case where the evidence weighs heavily against conviction.

{¶ 73} In conclusion, this court has often "recognized that sexual assault victims' reactions vary and a victim's normal behavior following a crime and delayed disclosure does not mean that a reasonable trier of fact lost its way in finding defendant guilty." *State v. O'Boyle*, 2024-Ohio-5480, ¶ 27 (8th Dist.), citing *Harris* 2020-Ohio-1497, at ¶ 53. Based upon all the foregoing, we overrule Wardlaw's third assignment of error.

## V. Assignment of Error No. 4 — Hearsay

{¶ 74} Wardlaw's fourth assignment of error argues that the trial court erred admitting into evidence the video interview of child-protection specialist Stephanie Moore with J.G. Wardlaw contends that the interview took place for investigative purposes rather than medical diagnosis and treatment and, therefore, does not fall

within a recognized exception to the general inadmissibility of hearsay. We disagree. Based upon established precedent in this district, we conclude that the trial court properly admitted the interview because the primary purpose of the interview was for Moore to evaluate J.G. for medical diagnosis and treatment. This assignment of error is overruled.

### A. Standard of Review

{¶ 75} ""'It is well established that, pursuant to Evid.R. 104, the introduction of evidence at trial falls within the sound discretion of the trial court.""'" *State v. Jeffries*, 2018-Ohio-5039, ¶ 10 (8th Dist.), quoting *Caruso v. Leneghan*, 2014-Ohio-1824, ¶ 32 (8th Dist.), quoting *State v. Heinish*, 50 Ohio St.3d 231, 239 (1990). Further, "'[a] trial court possesses broad discretion regarding the admission of evidence, including the discretion to determine whether evidence constitutes hearsay and whether it is admissible hearsay.'" *State v. Rosa*, 2019-Ohio-4888, ¶ 29 (8th Dist.), quoting *State v. Grooms*, 2018-Ohio-1093, ¶ 20 (8th Dist.), citing *State v. Graves*, 2009-Ohio-1133, ¶ 4 (9th Dist.). It is also well established that "we review the admission or exclusion of evidence by the trial court for an abuse of discretion." *State v. Griffin*, 2025-Ohio-1459, ¶ 32 (8th Dist.). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson,* 2021-Ohio-3304, at ¶ 35.

### B. Hearsay

{¶ 76} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered into evidence to prove

the truth of the matter asserted in the statement." Under Evid.R. 802, hearsay is not admissible unless the offered statement falls into a recognized exception to that rule. Evid.R. 803 sets forth several exceptions to the rule against hearsay. Applicable here is Evid.R. 803(4), which provides an exception for statements made for purposes of medical diagnosis and treatment and states:

> Statements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character or the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

{¶ 77} Indeed, "statements made for purposes of medical diagnosis and treatment are a clearly defined, long-standing exception to the rules of hearsay." *Rosa* at ¶ 30. Additionally, in considering cases of sexual assault and rape, ""courts have consistently found that a description of the encounter and identification of the perpetrator are within the scope of statements for medical treatment and diagnosis.""" *State v. Fears*, 2017-Ohio-6978, ¶ 36 (8th Dist.), quoting *Echols*, 2015-Ohio-5138, at ¶ 27 (8th Dist.), quoting *In re D.L.*, 2005-Ohio-2320, ¶ 21 (8th Dist.), citing *State v. Stahl*, 2005-Ohio-1137, ¶ 15 (9th Dist.). Further, "[i]n sexual assault cases involving young victims, there is often testimony from a child advocacy social worker. And courts have acknowledged the 'dual role' medical diagnosis/treatment and investigation/gathering of evidence — of social workers who interview a child who may be the victim of sexual abuse." *Id.* at ¶ 37. "Social workers are oftentimes in the best position to help determine the proper treatment for the minor, which

treatment includes determining which home was free of sexual abuse." *Id.*, citing *State v. Durham*, 2005-Ohio-202, ¶ 33 (8th Dist.).

{¶ 78} "However, not every statement made by a declarant in aid of treatment is admissible" under Evid.R. 803(4). *Rosa,* 2019-Ohio-488,8 at ¶ 30. "'The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.'" *Id.*, quoting Staff Note to Evid.R.803(4); *Echols* at ¶ 28. Specifically, "[t]o the extent a victim's statement to a social worker is for investigative or prosecutorial purposes, the statement will not fall within the hearsay exception under Evid.R. 803(4)." *Fears* at ¶ 38. "The fact that the information initially gathered by the social workers was subsequently used by the state in its prosecution, however, does not change the fact that these statements were not made for investigative or prosecutorial purposes." *Id.*, citing *State v. Muttart*, 2007-Ohio-5267, ¶ 62.

### C. The Trial Court Did Not Abuse Its Discretion in Admitting J.G.'s Video Interview With Moore.

{¶ 79} Wardlaw argues that the interview Moore conducted with J.G. was inadmissible at trial because it fell outside the exception to hearsay outlined by Evid.R. 803(4). Specifically, Wardlaw contends that the primary purpose of the interview was for investigative purposes and not for medical diagnosis and treatment. However, Moore repeatedly testified that the purpose of these interviews is to assess the safety of the child and to make referrals for any necessary medical

and psychological/mental-health needs. Further, when asked if the purpose of her interview changes when the interview is requested by law enforcement, Moore replied "absolutely not."

{¶ 80} Moore testified that she is a child-protection specialist with the Child Advocacy Center and her job includes interviewing children who may be the subject of abuse. Moore also testified that it is common for law enforcement to request that the Child Advocacy Center conduct these interviews to minimize the times that a victim must tell someone about the abuse as this can be traumatizing to them. Moore also noted that this is also the reason why the interviews are recorded.

{¶ 81} Further, Moore begins her interview with J.G. by informing her that Moore's job is to make sure she is healthy and safe and that she has everything she needs to be healthy and safe. Moore further notes that the interview is being recorded so that J.G. does not have to continue to report the abuse, *i.e.*, tell her story multiple times. The balance of the interview is confined to J.G. describing Wardlaw's abuse.

{¶ 82} Therefore, based upon our review of Moore's trial testimony as well as her interview with J.G., we conclude that the primary purpose of the interview was for medical diagnosis and treatment. Accordingly, the trial court did not abuse its discretion in admitting the interview at trial and this assignment of error is overruled.

## VI. Assignment of Error No. 5 — Sexually Violent Predator Specification

{¶ 83} Wardlaw's final assignment of error challenges the sufficiency of the evidence supporting his classification as a sexual violent predator under R.C. 2971.01(H). This assignment is without merit.

### A. Standard of Review

{¶ 84} "The standard of review for sufficiency of the evidence is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Goudlock*, 2010-Ohio-3600, ¶ 29 (8th Dist.), citing *State v. Jenks*, 61 Ohio St.3d 259 (1981), paragraph two of the syllabus. In a sufficiency inquiry, on review, "courts are to assess not whether the state's evidence is to be believed, but whether, if believed, the evidence against a defendant would support a conviction." *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *Thompkins*, 78 Ohio St.3d at 387.

### B. R.C. 2971.01(H) – Sexually Violent Predator Specification

{¶ 85} R.C. 2971.01(H)(1) defines a "sexually violent predator" as a "person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." Under this provision, Ohio courts have concluded that there are three elements or "factors" that "must exist before a defendant may be labeled as a sexually violent predator: (1) the offense occurred on or after January 1, 1997; (2) the defendant commits a sexually violent

offense; and (3) it is likely that the defendant will engage in at least one more sexually violent offense in the future." *Belle*, 2019-Ohio-787, at ¶ 34 (8th Dist.). Further, "the key inquiry for finding a defendant to be a sexually violent predator is whether the person is likely to engage in sexually violent offenses in the future." *Id.* "Because of the punitive aspects of the specification, for a sexually violent predator specification to apply to an offender, the state must prove beyond a reasonable doubt that R.C. 2971.01(H) applies to the offender." *Goudlock* at ¶ 30, citing *State v. Williams*, 88 Ohio St.3d 513, 532 (2000).

{¶ 86} R.C. 2971.01(H)(2) sets forth the factors to be considered when determining whether a defendant is a sexually violent predator:

(a) The person has been convicted two or more times, in separate criminal actions of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

{¶ 87} There is no requirement that all these factors must be satisfied to find a person to be a sexually violent predator. *State v. Sopko*, 2009-Ohio-140, ¶ 48 (8th Dist.), citing *State v. Williams*, 2001 Ohio App. LEXIS 4188, *14 (8th Dist. Sept. 20, 2001). Rather, "'[t]he statute specially notes that any of the factors may be considered as evidence that an individual is likely to engage in one or more sexually violent offenses.'" *Id.*, quoting *Williams* at *id.* Additionally, "[a]t a bench trial, there is a presumption that the judge will have considered only relevant, material and competent evidence in reaching a verdict, unless the record affirmatively demonstrates otherwise." *State v. Bugg*, 2000 Ohio App. LEXIS 1839, *16 (8th Dist. Apr. 7, 2000), citing *State v. Post*, 32 Ohio St.3d 380, 384 (1987).

### C. There Was Sufficient Evidence for the Trial Court to Find Wardlaw Qualified as a Sexually Violent Predator

{¶ 88} There is no dispute that the first two requirements of R.C. 2971.01(H) are satisfied. Wardlaw's offenses all occurred after January 1, 1997, and he committed a sexually violent offense. Thus, the only issue before this court is whether there was sufficient evidence for the trial court to find that Wardlaw was likely to commit a sexually violent offense in the future.

{¶ 89} The trial court found that Wardlaw was likely to commit a sexually violent offense in the future under R.C. 2971.01(H)(2)(a), 2971.01(H)(2)(c), and 2971.01(H)(2)(f). Wardlaw asserts that the trial court could not find him likely to commit a sexually violent offense in the future under R.C. 2971.01(H)(2)(a) because he had no sexually oriented convictions prior to the prosecution of this matter, and

the fact that this case involved multiple convictions arising from unlawful sexual conduct could not satisfy this provision. However, this court has repeatedly rejected this argument and Wardlaw provides no reason for us to deviate from this established precedent. *See State v. Bates*, 2024-Ohio-2909, ¶ 65-66 (8th Dist.), citing *State v. Hartman*, 2018-Ohio-2641, ¶ 24 (8th Dist.); *State v. Kelley*, 2024-Ohio-157, ¶ 81 (8th Dist.) ("'R.C. 2971.01(H) allows an offender to be classified and sentenced as a sexually violent predator based on the convictions of the underlying offense contained in the indictment.'"), quoting *Williams*, at ¶ 72, quoting *State v. Boynton*, 2010-Ohio-4670, ¶ 5 (8th Dist.).

{¶ 90} Further, viewing the evidence admitted at trial in a light most favorable to the State, we find that there was sufficient evidence for the trial court to determine that Wardlaw was a sexually violent predator under any one of these three subsections. Specifically, the evidence shows that Wardlaw committed multiple sexually motivated offenses over a period of 20 years and involved three minors. These minors included his biological daughter and a stepdaughter for whom he had been a father figure since she was a small child. Wardlaw also raped a minor who was a close friend of his stepdaughter while she was arguably under his custody and control during a sleepover at his apartment. Each of these minors provided detailed testimony at trial regarding the sexual abuse they suffered at the hands of Wardlaw. There was also DNA evidence introduced at trial that confirmed the existence of Wardlaw's DNA on the front and back panels of T.M.'s underwear. On this evidence, as well as the additional evidence offered at trial, we find that the trial court had

more than sufficient evidence to determine that Wardlaw was a sexually violent predator under R.C. 2971.01(H).  This assignment of error is overruled.

{¶ 91} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.  Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHELLE J. SHEEHAN, JUDGE

EILEEN A. GALLAGHER, A.J., and
DEENA R. CALABRESE, J., CONCUR