[Cite as *State v. Warren*, 2026-Ohio-1193.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | |
| | | No. 115327 |
| v. | : | |
| DERRICK WARREN, II, | : | |
| Defendant-Appellant. | : | |

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 2, 2026

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696442-A

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael Timms, Assistant Prosecuting Attorney, *for appellee.*

Allison S. Breneman, *for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} Defendant-appellant Derrick Warren, II ("Warren") appeals his rape convictions and sexually-violent-predator designation. Upon review, we affirm.

## I.    Facts and Procedural History

**{¶ 2}**    In November 2024, Warren was indicted by a grand jury in a six-count indictment for offenses that occurred in November 2012 against A.L.  Counts 1 through 4 charged Warren with rape, first-degree felonies.  Each carried a sexually-violent-predator specification for either fellatio, vaginal intercourse, digital vaginal penetration, or digital anal penetration.  Count 5 charged Warren with aggravated robbery, a first-degree felony, and Count 6 charged him with robbery, a second-degree felony.  Warren pleaded not guilty and elected to bifurcate the sexually-violent-predator specifications.  The matter proceeded with a jury trial in April 2025.

**{¶ 3}**    The following evidence was presented by the State at Warren's jury trial.[1]    First, A.L. offered testimony regarding the events that transpired in November 2012 and the circumstances that surrounded the initial investigation.  A.L. — who was sober and pursuing a career as a chemical dependency counselor at the time of trial — acknowledged that she previously battled a drug addiction, which she supported through sex work.  A.L. explained that she posted online ads and normally met with "regulars."  However, there came a day in November 2012 when she "was in a desperate situation" because she did not have any regular clients to meet and needed money to support her drug habit.  A.L. testified:  "[Warren] spoke with me about meeting up.  And as I recall, we were going to have sex.  The amount was $200-ish.  I was supposed to bring $50 in change.  That was weird, but again, I

---

[1] Some witness testimony is discussed out of order for clarity.

was in a desperate situation." In her desperation, A.L. looked past the abnormal request, borrowed $50 and a car, and drove to meet Warren at his house on the east side of Cleveland — an area that was "not at all" familiar to her.

{¶ 4} When A.L. arrived, she called Warren, pulled into the middle of a parking lot near a strip of houses, and inquired about the meeting's location. Rather than providing an address, Warren walked up to the car, entered the vehicle, and immediately asked for the $50. A.L. testified that Warren's demeanor changed; he started "acting really, really funny," reaching in his pockets, and stalling. A.L. "started to get super nervous" and "knew something bad was about to happen." In response to this "gut feeling," A.L. hid the $50 in her mouth and removed the keys from the ignition.

{¶ 5} A.L. testified, "That's when he had unzipped his pants and very, very forcefully — this is not where it is not any longer an escort relationship. It's not — this is where it becomes non-consensual. He unzipped his pants and forcefully grabbed my hair and started shoving his penis into my face and my mouth." Warren did not know the $50 was in A.L.'s mouth and repeatedly asked where it was. A.L. was panicked and believed Warren wanted to rape and rob her. According to A.L., Warren maintained control by forcefully grabbing and pulling her hair.

{¶ 6} A.L. then recounted how the encounter continued to escalate:

> He was so hung up on this money in between assaulting me. He was very, very, very aggressive. That all happened very fast. He then got into the backseat in the middle, always had my hair. Always had my hair, even if he had to switch, you know, in the back and grab my hair from another angle to get me to come. Now, I'm naked, okay, and he

has me naked, his pants down, and that's when he grabs me and puts me — and he rapes me vaginally. While he rapes me vaginally, he's also raping with me with his fingers in my vagina and my [buttocks], also while he's holding on to my hair and having his arms on me to have full control. He kept on — he kept on saying, do you want to have my baby, in a yelling tone, and every time I said no, he had punched me . . . [i]n my face, under my face, my head.

Warren did not use a condom and ejaculated inside of A.L. A.L. testified that she "always, always used protection" when she escorted. Warren then pushed or punched A.L. onto the floor of the front seat, where she located the car keys and was able to grab or pull her hair out of Warren's hand. Warren continued to ask about the $50, and A.L. told him that the money was shoved in the backseat. When Warren began looking for the money with "maybe like one knee in the car [and] one leg out," A.L. put the keys in the ignition and "took off."

{¶ 7} Naked and bloody, A.L. fled to a convenience store, said that she had been raped, and requested that 9-1-1 be called. Police and an ambulance responded to the call, and A.L. was taken to the hospital, where a sexual assault nurse examination was performed. A.L. recalled how the experience made her feel, stating:

Honestly, I felt like all the nurses and people, even the police and stuff, I constantly felt like they — everyone was staring at me. Like I did something wrong. Like I was kind of, you know, I was going to escort. That's wrong. But I just — I didn't feel like I was a victim. I felt like I was being judged. I was embarrassed. For the most part, that's the feelings I had and disgusting. I felt disgusting.

A.L. testified that she was not truthful when she spoke to the police and nurse because she was ashamed and thought she was going to be judged, disbelieved, and

"in trouble" for prior warrants. A.L. did not follow up with police because she felt like she "did [her] part" but was not supported thereafter. A.L. explained that police made retrieving some of her things "very, very difficult" and "no one was being professional about the next steps that were needed . . . ."

{¶ 8} Despite her initial lack of cooperation, A.L. recently met with investigators and began helping with their investigation. A.L. testified that her current experiences with investigators and life circumstances were "[l]ike day and night" compared to those in 2012:

> You know, I smile when I bring up you guys because you guys have been great. You guys made me fe[el] supported. You guys have really been there. Just a really positive atmosphere.
>
> Back then, my life was so different. Today I'm sober. I have over two years sober. Solid sobriety. I've had a few years of solid sobriety since back then. I'm a mom, a stay-at-home mom. Like there's a lot of things that I do today that I would have never done back then. Going back to school. There are a whole lot of things that are different in a positive manner. I'm comfortable. That's the main one.

{¶ 9} A.L. acknowledged that she made a statement to an investigator that her sexual encounter with Warren would have been consensual if he paid her, further explaining:

> And not punched me or raped me or there are so many factors that made it not consensual. It could have been consensual, if he didn't beat me and forcefully put his penis in my vagina, he if he didn't forcefully put his fingers in my [buttocks] or my [vagina]. You know, consensual sex normally doesn't involve punching or forceful nature without protection when you're saying no and they don't stop. That's when it's not consensual. It wasn't even — at that point, the money wasn't even — it turned into a fight and flight situation.
>
> . . .

What I meant by that is that if we would have met up like discussed, made a transaction like discussed, wasn't forcefully attacked, raped, undressed, assaulted, then . . . it could have been consensual, but all these other things happened, which made it an obvious rape and assault. You can't even make it seem or sound like it wasn't.

. . .

I planned for a consensual encounter with protection with not ever being punched or raped or held down or my hair ripped out of my head or have my baby, you want to have my baby, to the point where I'm blacking out and every time I say no, I know you want to hit me. If all of these things wouldn't have happened, yes, then it could have been consensual if he would have acted 100 percent like a normal, non-violent, threatening person, yes, it could have been.

A.L. reviewed photographs taken at the hospital following the assault and testified that they "show[] no justice" since her face — which was normally "way, way thinner" from drug use — was more swollen than it appeared. A.L. believed she identified the perpetrator in a photo lineup "[w]ith 90 percent confidence" in December 2023. A.L. also identified crime-scene photographs of the car she was driving and her belongings on the day of the incident as well as articles of clothing that were collected as evidence.

{¶ 10} On cross-examination, A.L. was questioned about the lies she told police and medical providers immediately following the incident — many of which she did not remember. A.L. reiterated that some of her initial statements were untruthful because she was embarrassed, ashamed, and felt disgusting; however, "the rape wasn't a lie." A.L. regretted lying and wished she would have told the truth. A.L. was also extensively questioned about subsequent statements she made to investigators and during her testimony on direct-examination. A.L. testified that

those accounts were not different versions of the 2012 encounter, stating: "There's one version. Depending on how I say it, doesn't make it not true." Defense counsel highlighted discrepancies in A.L.'s recounting of events and challenged her credibility by questioning "little slip-ups" in her rehabilitation. Defense counsel also revisited A.L.'s medical records, which had "absolutely no objective findings of injury" to her face, head, lips, eyes, or throat. A.L. countered that the medical records were "a load of junk."

{¶ 11} Next, testimony was offered about the initial investigation. Jarod Schlacht ("Deputy Chief Schlacht"), Cleveland Police Department's Deputy Chief at the time of trial, was working as a patrol officer in November 2012. He responded to a convenience store after a worker reported that a female came into the store saying she was raped. When Deputy Chief Schlacht arrived, A.L. was naked, covered with something given to her by the store's clerk, and distraught. Deputy Chief Schlacht learned that the assault occurred at a nearby location and "[n]ot too long beforehand." Deputy Chief Schlacht also obtained a description of the perpetrator before A.L. was taken to a local hospital. Deputy Chief Schlacht then processed the vehicle driven by A.L., which was towed and collected as evidence, and completed a report. Deputy Chief Schlacht's report did not include any information about A.L.'s physical appearance in terms of swelling, contusions, abrasions, or marks.

{¶ 12} Nina Charmley ("Charmley"), a sexual assault nurse examiner, examined A.L. at the hospital following the incident in 2012. Charmley explained that she took notes for a sexual-assault kit based on the information provided by

A.L. Those notes — which included a handwritten narrative of the events reported to Charmley by A.L. — indicated that A.L. was assaulted by one male who penetrated her vagina, anus, and mouth; ejaculated; and did not use a condom. With A.L.'s permission, Charmley was able to complete a full physical examination. Charmley testified that her visual findings were unremarkable, meaning she did not observe any bruising, swelling, or scratches at the time of the exam. During the examination, Charmley collected samples for the sexual-assault kit, including vaginal, rectal, and oral swabs and foreign black hairs located around A.L.'s pubic region.

{¶ 13} Those samples were itemized, documented, and prepared for DNA testing by Gaurie Kaur Sran ("Kaur Sran"), a former DNA technician at the Cuyahoga County Medical Examiner's Office. According to Kaur Sran, those items were then passed along to a DNA analyst. Marissa Esterline ("Esterline") — who was a forensic scientist at the Cuyahoga County Regional Forensic Science Laboratory at the time of trial — was the DNA technician or analyst who tested those samples following the 2012 incident. Esterline testified that she completed a multi-step laboratory process for each sample and the data obtained was then given to Laura Stanton ("Stanton") for report-writing purposes.

{¶ 14} Stanton, who was working in the Cuyahoga County Medical Examiner's Office as a forensic DNA analyst in 2012, offered testimony about her analysis of the DNA test results and the report she issued in 2013. Stanton testified that seminal material was identified in A.L.'s vaginal and rectal swabs. Presumptive tests also indicated the presence of semen in A.L.'s oral swabs, although the sample

could not be confirmed. Stanton further testified that an unknown male's DNA profile was obtained from some of the items, including the vaginal and rectal swabs.

{¶ 15} Testimony was then offered about the investigation that occurred years later. Cuyahoga County Prosecutor's Office Investigator Chris Gortz ("Investigator Gortz") took over A.L.'s case in August 2024. Investigator Gortz began his investigation by reviewing prior work on the case and reports completed by his office. Investigator Gortz learned that A.L. did not select Warren in the photo lineup completed in December 2023. Next, Investigator Gortz interviewed A.L. and Warren, both of whom were cooperative.

{¶ 16} During Warren's interview, Investigator Gortz showed him photographs of A.L., the location where the incident occurred, and the vehicle A.L. drove. Warren indicated that he never met or was sexually active with A.L. and handwrote "no sexual contact" on some of the photographs. While Warren was familiar with the incident's location, he did not recognize the vehicle driven by A.L. and was unfamiliar with the 2012 sexual-assault allegations. On cross-examination, Investigator Gortz acknowledged that there was no demonstrative evidence that Warren was ever in the vehicle aside from A.L.'s own testimony.

{¶ 17} Cuyahoga County Prosecutor's Office Investigator Dennis Bruening ("Investigator Bruening") assisted in the investigation and was present during Warren's interview. Investigator Bruening researched Warren's residences, identified a map of the area, and testified that two addresses associated with Warren in 2012 were marked on the map. Investigator Breunig also collected two buccal

swabs from Warren during his interview. The swabs were submitted to the county's crime laboratory for analysis.

{¶ 18} Esterline testified that she authored a supplemental DNA report in 2024, which included Warren's buccal swabs, the original laboratory findings, and additional findings based on updated technology. Warren's DNA matched epithelial and sperm fractions obtained from A.L.'s vaginal and rectal swabs and extracts from the black hair collected in 2012. Esterline testified that only A.L.'s DNA and Warren's DNA were found in all of her testing.

{¶ 19} The State rested and the following exhibits were admitted without objection: A.L.'s medical records, hospital photos, and sexual-assault kit; the 2013 DNA report; the 2024 DNA report; a map of the incident's location; the 2023 photo lineup; crime-scene photographs of the car driven by A.L. and her belongings; the clothes A.L. was wearing at the time of the incident; Warren's buccal swabs; and the photographs shown to Warren during his interview. The defense moved for acquittal under Crim.R. 29, which was denied by trial court. The defense then renewed its motion and rested.

{¶ 20} Ultimately, the jury found Warren guilty of rape, as charged in Counts 1 through 4 of the indictment, and not guilty of aggravated robbery and robbery, as charged in Counts 5 and 6 of the indictment. The trial court indicated that it would rule on the sexually-violent-predator specifications at sentencing.

{¶ 21} In the interim, a hearing was held on the sexually-violent-predator specifications. First, Deborah Casey ("Casey"), a retired sexual assault nurse

examiner, offered testimony about the sexual-assault examination she performed on a woman in February 2013 ("2013 victim"). The 2013 victim reported that she met the assailant on an escorting website and went to his house. The assailant told the 2013 victim that he was looking for money, covered her mouth and nose with his hand, claimed to be a police officer, threatened her, removed her clothing, and inserted his penis into her mouth and vagina. According to the 2013 victim, she told the assailant to stop but he did not listen. When the assailant was finished, he told the 2013 victim to get dressed and that he was not going to arrest her. After leaving the house, the 2013 victim called police. In addition to recording the 2013 victim's narrative, Casey performed a physical exam and collected swabs for a sexual-assault kit.

{¶ 22} Next, Investigator Gortz offered testimony in conjunction with a video recording of his interview with Warren. During the interview, Warren indicated that he was previously involved in a similar situation, claiming that "in 2013 a female lied on him." Investigator Gortz reviewed the 2013 case and advised that Warren ultimately pleaded guilty to attempted felonious assault, a nonsexual offense.

{¶ 23} According to Investigator Gortz, Warren also referenced a 2019 case during the interview, claiming that another female lied about his involvement in another sexual assault. Investigator Gortz reviewed and collected records from the 2019 case, including medical records with the victim's sexual-assault-kit narrative. The 2019 victim reported that she was lost and pulled into an apartment complex.

Her assailant pistol whipped her, jumped in her car, held her at gunpoint, pulled her hair, hit her, ripped off her clothes, and forced her to perform fellatio and engage in sexual intercourse without a condom. The 2019 victim called the police once the perpetrator left the scene. Warren was subsequently indicted for kidnapping, rape, and having weapons while under disability and ultimately pleaded guilty to attempted rape and having weapons while under disability. On cross-examination, Investigator Gortz acknowledged that A.L.'s case was Warren's second sexual-assault conviction.

{¶ 24} The State admitted medical records and journal entries from the 2013 and 2019 cases and the video recording of Warren's interview. Based on the evidence presented, the State argued that Warren should be designated a sexually-violent predator since his sexually-motivated crimes continued and escalated after the rape of A.L. in 2012. The State further argued that Warren showed no remorse and continued to blame his victims.

{¶ 25} Following the hearing, a presentence-investigation report was ordered. The State filed a sentencing memorandum and sexually-violent-predator brief. The defense also filed a sentencing memorandum.

{¶ 26} At the sentencing hearing, the trial court heard from A.L., the State, and defense counsel, who advised Warren against making a statement for appellate purposes. The trial court noted that it considered the record, oral statements of the parties and victim, and the presentence-investigation report before sentencing Warren to life in prison with parole eligibility after ten years. The trial court also

determined that Warren was a sexually violent predator pursuant to R.C. 2971.01, finding that Warren committed one or more offenses in which the victims were harmed to the degree that their lives were in jeopardy. Finally, the trial court designated Warren a Tier III sex offender with lifetime registration requirements.

{¶ 27} Warren appeals, raising three assignments of error for review.

**Assignment of Error No. 1**

The jury found, against the manifest weight of the evidence, that [Warren] committed the acts alleged in the indictment.

**Assignment of Error No. 2**

The evidence was not legally sufficient to sustain a guilty verdict.

**Assignment of Error No. 3**

The trial court erred in finding [Warren] met the standards of a sexually-violent predator.

## II. Law and Analysis

### A. Sufficiency and Manifest Weight of the Evidence

{¶ 28} For ease of analysis, we address Warren's first and second assignments of error together. In his first assignment of error, Warren argues that his convictions were against the manifest weight of the evidence and the jury lost its way in finding him guilty. Warren asserts that the State relied solely on A.L.'s testimony — which was neither credible nor truthful — to establish he was guilty of rape. In his second assignment of error, Warren challenges the sufficiency of the evidence, claiming again that A.L.'s testimony was not credible. Warren asserts that

A.L.'s testimony alone, without corroborating evidence, is insufficient to prove his guilt beyond a reasonable doubt.

{¶ 29} Sufficiency of the evidence and manifest weight of the evidence are two distinct concepts: "'sufficiency is a test of adequacy'" while manifest weight depends on the evidence's "'"effect in inducing belief."'" *In re Z.C.*, 2023-Ohio-4703, ¶ 13, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997), quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 30} A challenge to the sufficiency of the evidence supporting a conviction requires a reviewing court to determine whether the State has met its burden of production at trial. *Thompkins* at 390. When reviewing a sufficiency challenge, an appellate court "examine[s] the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.*

{¶ 31} During its review for sufficiency of the evidence, an appellate court does not assess whether the State's evidence is to be believed, "but whether, if believed, the evidence against a defendant would support a conviction." *Thompkins* at 390. Indeed, when evaluating evidence's sufficiency, a reviewing court does not contemplate witness credibility or weigh the evidence; rather, "the reviewing court assumes that witnesses testified truthfully and evaluates whether that testimony,

along with any other direct or circumstantial evidence presented at trial, satisfies each element of the offense." *State v. Haskins*, 2024-Ohio-5908, ¶ 37 (8th Dist.), citing *State v. Young*, 2022-Ohio-3132, ¶ 47 (8th Dist.), and *Cleveland v. Clark*, 2024-Ohio-4491, ¶ 37, 39 (8th Dist.) (noting that a challenge to the sufficiency of the evidence presents a question of law, not fact).

{¶ 32} "But 'even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *In re Z.C.*, 2023-Ohio-4703, at ¶ 14, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12. Unlike a sufficiency challenge, which questions whether the State has met its burden of production, a manifest-weight challenge questions whether the State has met its burden of persuasion. *State v. Bowden*, 2009-Ohio-3598, ¶ 13 (8th Dist.), citing *Thompkins,* 78 Ohio St.3d at 390. In order to evaluate whether a judgment or verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether the jury clearly lost its way in resolving conflicts and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Jordan*, 2023-Ohio-3800, ¶ 17, citing *Thompkins* at 387, and *State v. Martin*, 20 Ohio App.3d 172 (1st Dist. 1983).

{¶ 33} The Ohio Supreme Court has repeatedly held that "[a] manifest-weight challenge should be sustained "'only in the exceptional case in which the evidence weighs heavily against the conviction.""" *State v. Nicholson*, 2024-Ohio-

604, ¶ 71, quoting *Thompkins* at 387, quoting *Martin* at 175; *State v. Hundley*, 2020-Ohio-3775, ¶ 80. "'[A] defendant is not entitled to a reversal on manifest-weight grounds merely because inconsistent evidence was presented at trial.'" *State v. Kilton*, 2019-Ohio-87, ¶ 20, quoting *State v. Mossburg*, 2013-Ohio-1664, ¶ 22 (8th Dist.). Nor is a conviction against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over the defendant's. *State v. Wells*, 2021-Ohio-2585, ¶ 40 (8th Dist.), citing *State v. Williams*, 2018-Ohio-3368, ¶ 67 (8th Dist.).

{¶ 34} With these concepts in mind, we review Warren's rape convictions to determine 1) whether sufficient evidence was presented and 2) whether the convictions were against the manifest weight of the evidence.

{¶ 35} Warren was convicted of four counts of rape under R.C. 2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the offender purposefully compels the other person to submit by force or threat of force." R.C. 2907.01 defines "sexual conduct" as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 36} After thorough review of relevant caselaw and the record before us, we find that Warren's rape convictions are supported by sufficient evidence. A.L.'s testimony established that her "escort relationship" with Warren ended and the

encounter quickly became nonconsensual when Warren became aggressive and began violently assaulting her. A.L. testified that Warren grabbed and pulled her hair to maintain control; pushed and punched her; and forced her to undress, perform fellatio, and engage in vaginal intercourse without protection, digital vaginal penetration, and digital anal penetration. A.L. further testified that Warren's assault continued despite her pleas to stop. A.L. fled to a convenience store, naked and bloody, and immediately reported the rape to police. A.L. told police and the sexual assault nurse examiner that she was assaulted by a male who penetrated her vagina, anus, and mouth without a condom. Swabs and samples collected from A.L.'s examination contained DNA that was later matched to Warren.

{¶ 37} We emphasize that this court does not assess A.L.'s credibility or determine whether the State's evidence is to be believed in a sufficiency analysis. Instead, we ask whether, if believed, the evidence against Warren would support his rape convictions. After viewing the evidence in a light most favorable to the State, we find that any rational trier of fact could have found that the essential elements of rape were proven beyond a reasonable doubt. Thus, Warren's convictions for rape are supported by sufficient evidence.

{¶ 38} Moreover, we cannot say that this is the exceptional case where the evidence weighs heavily against Warren's rape convictions. We acknowledge some discrepancies in A.L.'s recounting of events throughout the course of multiple investigations spanning over a decade. However, A.L. consistently alleged that she was forced to perform fellatio and engage in vaginal intercourse without protection,

digital vaginal penetration, and digital anal penetration from the onset. Throughout her testimony, A.L. readily acknowledged that she lied to police and medical professionals during the initial investigation, explaining that she felt ashamed and disgusting and thought she was going to be judged, disbelieved, and in legal trouble. A.L. testified that her recent experiences with investigators and life circumstances were much different than they were in 2012: she felt supported, was "solid" in her sobriety, became a mother, and was enrolled in school to pursue a career as a chemical dependency counselor.

{¶ 39} Based on this record, the jury did not clearly lose its way in resolving conflicts or create a manifest miscarriage of justice when it found that Warren engaged in sexual conduct with A.L. and purposefully compelled her to submit to that conduct by force or threat of force. Indeed, it is well-established that "[a] conviction may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's testimony be corroborated to be believed." *State v. Flores-Santiago*, 2020-Ohio-1274, ¶ 38 (8th Dist.) (citing multiple cases in support); *State v. Rivera*, 2024-Ohio-4896, ¶ 64 (8th Dist.) (noting that this well-settled principle applies to cases involving allegations of sexual assault); *State v. Winston*, 2024-Ohio-4583, ¶ 49 (8th Dist.) (upholding a defendant's convictions for rape and other offenses — despite some inconsistencies between the victim's trial testimony and prior statements made when she disclosed the abuse — where the defendant argued on appeal that the State's entire case rested solely on the credibility of the victim's testimony). Warren is not entitled to a

reversal on manifest-weight grounds merely because certain evidence or aspects of a witness' testimony were inconsistent. Nor is Warren entitled to reversal because the trier of fact chose to believe the State's version of events over his. Thus, Warren's rape convictions were not against the manifest weight of the evidence.

{¶ 40} Accordingly, Warren's first and second assignments of error are overruled.

## B. Sexually-Violent-Predator Designation

{¶ 41} In his third assignment of error, Warren argues that the trial court erred in finding that he met the standards of a sexually violent predator.

{¶ 42} A "sexually violent predator" is "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). Thus, in order to establish that a sexually-violent-predator specification applies to a defendant, the State must prove three elements beyond a reasonable doubt: "'(1) the offense occurred on or after January 1, 1997; (2) the defendant commit[ted] a sexually violent offense; and (3) it is likely that the defendant will engage in at least one more sexually violent offense in the future.'" *State v. Wardlaw*, 2025-Ohio-2221, ¶ 85 (8th Dist.), quoting *State v. Belle*, 2019-Ohio-787, ¶ 34 (8th Dist.), and citing *State v. Goudlock*, 2010-Ohio-3600, ¶ 30 (8th Dist.). The third element is "'the key inquiry'" in determining whether a defendant qualifies as a sexually violent predator under R.C. 2971.01(H)(1). *Id.*, quoting *id.*

{¶ 43} It is undisputed that the first two elements are satisfied: Warren committed a sexually violent offense after January 1, 1997. Therefore, the only issue before this court is whether Warren is likely to engage in a sexually violent offense in the future.

{¶ 44} Fortunately, the statute provides some guidance regarding this third element and key inquiry. R.C. 2971.01(H)(2) enumerates a nonexclusive list of six factors that "*may* be considered as evidence tending to indicate that there is a likelihood that the person will engage in the future in one or more sexually violent offenses." (Emphasis added.) Those factors are:

(a) The person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense or a child-victim oriented offense. For purposes of this division, convictions that result from or are connected with the same act or result from offenses committed at the same time are one conviction, and a conviction set aside pursuant to law is not a conviction.

(b) The person has a documented history from childhood, into the juvenile developmental years, that exhibits sexually deviant behavior.

(c) Available information or evidence suggests that the person chronically commits offenses with a sexual motivation.

(d) The person has committed one or more offenses in which the person has tortured or engaged in ritualistic acts with one or more victims.

(e) The person has committed one or more offenses in which one or more victims were physically harmed to the degree that the particular victim's life was in jeopardy.

(f) Any other relevant evidence.

R.C. 2971.01(H)(2). Notably, "[t]here is no requirement that all [six] factors must be satisfied to find a person to be a sexually violent predator." *Wardlaw* at ¶ 87, citing *State v. Sopko*, 2009-Ohio-140, ¶ 48 (8th Dist.), citing *State v. Williams*, 2001 Ohio App. LEXIS 4188, *14 (8th Dist. Sept. 20, 2001).

{¶ 45} On appeal, Warren argues that many of the R.C. 2971.01(H)(2) factors are inapplicable and challenges those that arguably are. First, Warren asserts that his rape convictions in the underlying case should not be included when considering R.C. 2971.01(H)(2)(a) — whether "[t]he person has been convicted two or more times, in separate criminal actions, of a sexually oriented offense." Warren claims that he was convicted of only one other sexual offense — his 2019 conviction for attempted rape — and, therefore, the first factor is inapplicable. Next, Warren argues that the evidence failed to establish that his offenses involved life-threatening physical harm under R.C. 2971.02(H)(2)(e). Warren further asserts that the trial court did not specify any of the "other relevant evidence" that it considered for purposes of R.C. 2971.02(H)(2)(f)'s catchall. Finally, Warren contends that evidence of his prior attempted-rape conviction, alone, is inadequate to establish his likelihood of recidivism. While Warren references R.C. 2971.02 and discusses the R.C. 2971.02(H)(2) factors, he does not cite any authority directly supporting his arguments. When an appellant fails to cite any legal authority in support of their claims, this court is allowed to disregard them. *See* App.R. 12(A)(2); App.R. 16(A)(7).

{¶ 46} Based on the record before us — and in the absence of authority cited to the contrary — we cannot say that the trial court erred in designating Warren a sexually violent predator. The record reveals that after Warren raped A.L. in 2012, two other women made sexual-assault allegations resulting in convictions. The 2013 victim reported that she met her assailant on an escorting website. When she met with the assailant, he was looking for money, covered her mouth and nose with his hand, claimed to be a police officer, threatened her, removed her clothing, and inserted his penis into her mouth and vagina. According to the 2013 victim, she told the assailant to stop but he did not listen. Charges were brought against Warren based on her report. Warren entered a plea deal and was convicted of attempted felonious assault.

{¶ 47} The 2019 victim reported that she was raped after getting lost and pulling into an apartment complex. Her assailant pistol whipped her, jumped in her car, held her at gunpoint, pulled her hair, hit her, ripped off her clothes, and forced her to perform fellatio and have sexual intercourse without a condom. As a result of the 2019 victim's report, Warren was indicted for kidnapping, rape, and having weapons while under disability. Warren entered a plea deal and was convicted of attempted rape and having weapons while under disability. During his interview with investigators, Warren claimed that 2013 and 2019 victims "lied on him."

{¶ 48} While Warren was ultimately convicted of a nonsexual offense in 2013, the evidence presented establishes that his sexually-motivated crimes continued — and even violently escalated — after A.L.'s rape in 2012. Warren has

not provided any legal support to suggest that his sexually-violent-predator designation was unlawful under the specific facts and circumstances of this case. Nor can we say that the trial court erred in determining that Warren was likely to engage in another sexually violent offense in the future based on this record. Accordingly, we decline to find that the trial court erred in designating Warren a sexually violent predator and overrule his third assignment of error.

{¶ 49} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

MICHAEL JOHN RYAN, J., and
TIMOTHY W. CLARY, J., CONCUR